# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Employers' Fire Insurance Co.,

       Plaintiff/Counter-Defendant,

  vs.

ProMedica Health System, Inc.,

       Defendant/Counter-Plaintiff.

Case No.: 3:11-cv-00923-JZ

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT EMPLOYERS' FIRE INSURANCE CO.'S MOTION FOR SUMMARY JUDGMENT

Thomas J. Judge (*pro hac vice*)
April H. Gassler (*pro hac vice*)
THOMPSON, LOSS &
JUDGE, LLP
1133 21st Street, NW
Suite 450
Washington, DC 20036
Tel: (202) 778-4060
Fax: (202) 778-4099
tjudge@tljlaw.com
agassler@tljlaw.com

Julie L. Juergens (0066873)
GALLAGHER SHARP
1501 Euclid Avenue
6th Floor
Cleveland, OH 44115
Tel: (216) 522-1372
Fax: (216) 241-1608
jjuergens@gallaghersharp.com

*Attorneys for Plaintiff/Counter-Defendant Employers' Fire Insurance Co.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF ISSUES .................................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 2

STATEMENT OF FACTS .................................................................................................... 3

    The 09/10 Policy ............................................................................................................ 3

    The FTC Claim and Untimely Notice to OneBeacon ........................................................ 5

    The 10/11 Policy ............................................................................................................ 8

ARGUMENT ........................................................................................................................ 8

I.      THE FTC CLAIM WAS FIRST MADE DURING THE 09/10 POLICY PERIOD ........... 11

     A.    The FTC's "Full" Investigation And Its Resolution Authorizing The Use Of
          Compulsory Process Was An Administrative Or Regulatory Proceeding For
          Non-Monetary Relief Commenced By A Formal Order Of Investigation ................. 12

     B.    The FTC's Subpoenas And CIDs Were Written Demands For Non-Monetary
          Relief ...................................................................................................................15

     C.    The FTC's Demand For A Hold Separate Agreement Was A Demand For
          Non-Monetary Or Injunctive Relief ......................................................................... 17

II.    THE 09/10 POLICY DOES NOT AFFORD COVERAGE FOR THE FTC CLAIM
      BECAUSE PROMEDICA DID NOT REPORT THE CLAIM TO ONEBEACON
      WITHIN THE POLICY'S CLAIM REPORTING PERIOD ............................................. 18

III.   THE 10/11 POLICY DOES NOT AFFORD COVERAGE FOR THE FTC CLAIM
      BECAUSE THE CLAIM WAS FIRST MADE DURING 09/10 POLICY PERIOD ........ 18

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ace American Insurance Co. v. Ascend One Corp.*,
570 F. Supp. 2d 789 (D. Md. 2008) ................................................................. 14, 16

*American Center for International Labor Solidarity v. Federal Insurance Co.*,
518 F. Supp. 2d 163 (D.D.C. 2007) ......................................................................... 19

*Asp v. Ohio Medical Transportation, Inc.*,
No. 00AP-958, 2001 WL 721854 (Ohio Ct. App. June 28, 2001) ..................................... 10, 18

*C.V. Perry & Co. v. Jefferson*,
110 Ohio App. 3d 23, 673 N.E.2d 613 (1996) ................................................................. 19

*Dan Nelson Automotive Group, Inc. v. Universal Underwriters Group*,
No. Civ. 05-4044, 2008 WL 170084 (D.S.D. Jan. 15, 2008) .................................................. 16

*Elkins v. American International Special Lines Insurance Co.*,
611 F. Supp. 2d 752 (S.D. Ohio 2009) ................................................................... 10, 18

*First Defiance Financial Corp. v. Progressive Casualty Insurance Co.*,
688 F. Supp. 2d 703 (N.D. Ohio 2010) .......................................................................... 9

*King v. Nationwide Insurance Co.*,
35 Ohio St. 3d 208, 519 N.E.2d 1380 (1988) ................................................................. 9

*Klaxon Co. v. Stentor Electric Manufacturing Co.*,
313 U.S. 487 (1941) .................................................................................................. 9

*Minuteman International, Inc. v. Great American Insurance Co.*,
Case No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) .......................................... 15

*Mueller v. Taylor Rental Center*,
106 Ohio App. 3d 806, 667 N.E.2d 427 (1995) ............................................................. 10, 18

*National Stock Exchange v. Federal Insurance Co.*,
No. 06-cv-1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007) ........................................... 13, 14

*Nationwide Mutual Insurance Co. v. Ferrin*,
21 Ohio St. 3d 43, 487 N.E.2d 568 (1986) ................................................................... 9

*Richardson Electronics, Ltd. v. Federal Insurance Co.*,
120 F. Supp. 2d 698 (N.D. Ill. 2000) ...................................................................... 15, 16

*Royal Insurance Co. of America v. Orient Overseas Container Line Ltd.*,
    525 F.3d 409 (6th Cir. 2008) ................................................................................. 8

*Trice v. Employers Reinsurance Corp.*,
    124 F.3d 205, 1997 WL 449736 (7th Cir. July 28, 1997)..................................... 10

*United States v. A.C. Strip*,
    868 F.2d 181 (6th Cir. 1989) ............................................................. 2, 11, 18, 19

*Westfield Insurance Co. v. Galatis*,
    100 Ohio St. 3d 216, 797 N.E.2d 1256 (2003) ........................................................ 9

*Westport Insurance Corp. v. Coffman*,
    No. C2-05-1152, 2009 WL 243096 (S.D. Ohio Jan. 29, 2009) ............................... 19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)................................................................................................ 17

## Statutes

15 U.S.C. § 46........................................................................................................... 16
15 U.S.C. § 49........................................................................................................... 16
15 U.S.C. § 50........................................................................................................... 16
15 U.S.C. § 57b-1 ..................................................................................................... 16

## Rules

Fed. R. Civ. P., Rule 56 ............................................................................................. 8

## Other Authorities

United States Federal Trade Commission Operating Manual ................................. 12, 13

## STATEMENT OF ISSUES

I.     A claims-made policy issued by plaintiff/counter-defendant Employers' Fire Insurance Co. ("OneBeacon") to defendant/counter-plaintiff ProMedica Health System, Inc. ("ProMedica") that was in effect in August 2010 (the "09/10 Policy") defined a "Claim" to include a written demand for non-monetary or injunctive relief or an administrative or regulatory proceeding for such relief commenced by the filing of a formal investigative order or similar document for a Wrongful Act.[1]  A Wrongful Act, in turn, was defined to include alleged violations of antitrust laws.  In August 2010, the United States Federal Trade Commission (the "FTC") commenced a "full" investigation of ProMedica's acquisition of St. Luke's Hospital ("St. Luke's), including an FTC formal resolution authorizing service of subpoenas and civil investigative demands ("CIDs") relating to whether the acquisition violated antitrust laws.  The FTC also demanded that ProMedica agree not to integrate with St. Luke's during the investigation.  Did these actions by the FTC constitute a "Claim" under the 09/10 Policy?

II.     The 09/10 Policy, which expired on September 29, 2010, plainly required Claims to be reported within 90 days of the policy's expiration, i.e., by December 27, 2010.  ProMedica undeniably did not report the FTC investigation to OneBeacon within that 90-day period, and indeed provided no notice to OneBeacon until after the FTC's commencement of litigation in January 2011.  Does this lack of notice preclude coverage under the 09/10 Policy?

III.     The OneBeacon policy issued to ProMedica in September 2010 (the "10/11 Policy") covers only Claims that are *first made* during its Policy Period and thus does not respond to lawsuits commenced during its Policy Period that are, in fact, the continuation of a Claim made prior to the Policy Period or "Related" to such a prior Claim.  If the FTC's investigation in August 2010 was a Claim, are the FTC's January 2011 lawsuits that resulted

---

[1]Capitalized terms, not otherwise defined, are defined terms in the insurance policies.

from the investigation part of the same Claim or, at a minimum, "Related Claims" such that the FTC's lawsuits do not constitute a claim first made during the 10/11 Policy?

## **SUMMARY OF ARGUMENT**

In this insurance coverage dispute, OneBeacon seeks to enforce unambiguous claims-made and reporting terms of the insurance policies it issued to ProMedica.  Under the first of the two policies OneBeacon issued (the "09/10 Policy"), ProMedica failed to provide OneBeacon with timely notice of a Claim in the form of an FTC "full" investigation in August 2010 with subpoenas, CIDs, and a demand to hold St. Luke's separate, even though the policy afforded ProMedica with ninety days, following the policy's September 2010 expiration, to provide such notice.  Instead, ProMedica first provided notice to OneBeacon in January 2011, after the FTC's August 2010 Claim had evolved into litigation, and attempted to invoke coverage under a subsequent OneBeacon policy (the "10/11 Policy") that incepted in September 2010.  The plain terms of both OneBeacon policies (the "Policies") preclude coverage.  Coverage under the 09/10 Policy is barred by ProMedica's undisputed failure to report the claim in accordance with the Policy's requirements, and coverage under the 10/11 Policy is barred because the litigation commenced by the FTC in January 2011 is not a Claim "first made" during the term of the 10/11 Policy.  As shown herein, state and federal courts applying controlling Ohio law, including the United States Court of Appeals for the Sixth Circuit, have strictly enforced similar claims-made and reporting terms in similar circumstances.  *See, e.g.*, *United States v. A.C. Strip*, 868 F.2d 181 (6th Cir. 1989).

**The 09/10 Policy**

OneBeacon issued Management Liability Policy No. MML-00064-09 to ProMedica for the claims-made Policy Period effective from September 29, 2009 to September 29, 2010 (the "09/10 Policy" or the "Policy"). (OneBeacon's Supplemental Statement of Undisputed Facts ("SSUF"), ¶ 1). At the very top of the Policy, the following statement is made in bold and capital letters:

> **PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD . . . . PLEASE READ THE ENTIRE POLICY CAREFULLY.**

(*Id.*, ¶ 2 (emphasis in original)).

The Policy includes a Directors, Officers & Organization Liability Coverage Section (the "D&O Coverage"). (*Id.*, ¶ 3). The D&O Coverage Insuring Agreement provides, in pertinent part, that "[OneBeacon] will pay, on behalf of [ProMedica], Loss from *any Claim first made against [ProMedica] during the Policy Period* . . . for a Wrongful Act; *provided that such Claim is reported to [OneBeacon] in accordance with Section VIII of this Coverage Section*." (*Id.*, ¶ 3 (emphasis added)).

The Policy defines a "Claim," in pertinent part, as:

(1)    a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or

(2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by:

    (a)    the service of a complaint or similar pleading;

    (b)    the return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (c)    the filing of a notice of charges, formal investigative order or similar document

against an Insured for a Wrongful Act . . . .

(*Id.*, ¶ 6).

The 09/10 Policy's D&O Coverage defines a "Wrongful Act," in relevant part, as "any actual or alleged act, error, omission . . . or breach of duty by [ProMedica]," including any "Antitrust Violation."  (*Id.*, ¶ 8).  An "Antitrust Violation" includes:

> [A]ny actual or alleged: price fixing . . . ; restraint of trade; monopolization; or violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1936, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, ordinance, regulation or common law.

(*Id.*, ¶ 9).

Section VIII of the D&O Coverage expressly provides that, "[i]f, during the Policy Period . . . any Claim is first made against an Insured, the Insureds must, as a condition precedent to any right to coverage . . ., give [OneBeacon] written notice of such Claim . . . in no event later than . . . ninety (90) days after the end of the Policy Period."[2]  (*Id.*, ¶ 4).  Thus, any claim first made during the 09/10 Policy Period had to be reported to OneBeacon no later than December 27, 2010.

The 09/10 Policy also has provisions addressing "Related Claims," which are defined as:

> [A]ll Claims for Wrongful Acts based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way.

(*Id*. ¶ 10).  The Policy provides that "[a]ll Related Claims, whenever made, shall be deemed a single Claim made when the earliest of such Related Claims was first made . . . ."  (*Id.*).

---

[2] The 09/10 Policy also includes a provision for the reporting of any "Wrongful Act which may subsequently give rise to a Claim."  (*Id.*, ¶ 5).  If the Insured provides OneBeacon with the requisite notice of such a Wrongful Act, "then any Claim subsequently made against an Insured arising out of such Wrongful Act shall . . . be treated as if it had been first made during the Policy Period."  (*Id.*).

**<u>The FTC Claim and Untimely Notice to OneBeacon</u>**

ProMedica operates a not-for-profit healthcare system serving Northwest Ohio and Southeastern Michigan. (*Id.*, ¶ 11). St. Luke's was formerly an independent, non-profit general acute-care community hospital located in Maumee, Ohio. (*Id.*). On May 25, 2010, ProMedica and St. Luke's entered into an agreement (the "Joinder Agreement"), pursuant to which ProMedica would acquire St. Luke's (the "Acquisition"). (*Id.*, ¶ 12). The Joinder Agreement initially scheduled the Acquisition to close on July 30, 2010. (*Id.*).

On July 15, 2010, FTC Attorney Jeanne Liu sent a letter to ProMedica's outside counsel, David Marx at McDermott Will Emery ("McDermott"). (*Id.*, ¶ 13). In the letter, Attorney Liu informed ProMedica that the FTC's Bureau of Competition had opened a non-public preliminary investigation to determine whether the Acquisition may be anticompetitive and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. (*Id.*). Attorney Liu also advised ProMedica that, if at the conclusion of the investigation the FTC determined that the Acquisition would likely have anticompetitive effects, the FTC could seek a preliminary injunction blocking or rescinding consummation of that transaction. (*Id.*). On July 16, 2010, Attorney Liu issued a "voluntary access letter" on behalf of the FTC to Attorney Marx at McDermott requesting that ProMedica voluntarily produce certain information and materials to assist the FTC in determining whether the Acquisition may violate federal antitrust laws. (*Id.*, ¶ 14).

On July 29, 2010, representatives from ProMedica and St. Luke's, including their in-house counsel, outside counsel, and economic consultants, met with FTC staff in Washington, D.C. to discuss the Acquisition. (*Id.*, ¶ 15). On August 5, 2010, as a follow up to that meeting, ProMedica's counsel at McDermott submitted a detailed statement to the FTC attempting to address the FTC's concern "that the transaction will reduce the number of competitors providing

acute inpatient hospital services in the Toledo area from four to three and thereby enable ProMedica to exercise market power by raising prices or otherwise harming consumers of hospital services because of the loss of St. Luke's as an independent competitor." (*Id*., ¶ 16).

Despite the efforts of ProMedica's counsel to convince the FTC that the Acquisition would not violate antitrust laws, the FTC notified ProMedica, on August 6, 2010, that its investigation was moving from an initial phase investigation into a "full-phase" investigation, which would include the FTC's authorization of compulsory process. (*Id*., ¶ 17). On August 9, 2010, the FTC issued a Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation (FTC File No. 101-0167) (the "Resolution"). (*Id.*, ¶ 18). The Resolution authorized the use of any and all compulsory process available to the FTC to be used to determine whether the Acquisition violated the Federal Trade Commission Act or the Clayton Act. (*Id.*).

On August 13, 2010, the FTC served ProMedica with subpoenas to provide testimony under oath in investigative hearings. (*Id.*, ¶ 19). Subsequently, on August 25, 2010, the FTC served ProMedica with subpoenas and CIDs requiring ProMedica to produce various documents and information. (*Id.* ¶ 20). The FTC subsequently commenced an action in this Court, on October 13, 2010, seeking a judicial order compelling ProMedica to comply with its subpoenas and CIDs. (*Id*., ¶ 22).

During the course of the FTC's preliminary investigation, ProMedica voluntarily agreed to delay closing the Acquisition until mid-August 2010. (*Id.*, ¶ 23). On August 10, 2010, however, the FTC sent ProMedica a written demand that ProMedica "agree to certain limited constraints on its operation of [St. Luke's] for a period of 60 days following consummation of the [Acquisition]" (the "Hold Separate Agreement"). (*Id*., ¶ 24). ProMedica entered into the

Hold Separate Agreement on August 18, 2010. (*Id.*). Under the Hold Separate Agreement, ProMedica agreed to "maintain the viability, competitiveness, and marketing ability of St. Luke's; not sell or transfer any assets of St. Luke's other than in the ordinary course of business; and not cause or permit the destruction, removal, wasting, or deterioration, or otherwise impair the viability, competitiveness or marketability of St. Luke's." (*Id.*, ¶ 25). The FTC sought the Hold Separate Agreement, which would maintain the *status quo* of St. Luke's as a separate entity post-consummation, so that it would not be necessary for the FTC to immediately seek a preliminary injunction to block the Acquisition. The Acquisition was consummated on August 31, 2010. (*Id.*, ¶ 26).

Despite the fact that the FTC had sought and received a Hold Separate Agreement, commenced a full investigation, issued subpoenas and CIDs requiring testimony and documents, and had actually filed suit against ProMedica to enforce the subpoenas and CIDs, ProMedica did not provide any notice to OneBeacon of a Claim or provide any information about the FTC proceedings during the 09/10 Policy Period or the Policy's post-expiration 90-day Claim reporting period. (*Id.*, ¶¶ 29, 33).

The FTC investigation led to its filing of administrative and civil actions against ProMedica in January 2011. On January 6, the FTC commenced an administrative action styled, *In the Matter of ProMedica Health System, Inc.*, Docket No. 9346 (the "Administrative Action"). (*Id.* at ¶ 27). The following day, the FTC filed a lawsuit styled, *Federal Trade Commission and State of Ohio v. ProMedica Health System, Inc.*, Case No. 3:11-cv-00047 (N.D. Ohio). (*Id.*, ¶ 28). In both matters, the FTC alleges that the Acquisition violates Section 7 of the Clayton Act. (*Id.*, ¶¶ 27-28). In the lawsuit, the FTC sought, *inter alia*, a preliminary injunction that would effectively continue the Hold Separate Agreement, which, after extension, was

otherwise scheduled to expire on January 18, 2011. (*Id.*, ¶ 28). On March 29, 2011, the court entered a preliminary injunction against further integration of ProMedica and St. Luke's and held that, if allowed to proceed, the Acquisition most likely would violate antitrust laws. (*Id.*, ¶ 30).

ProMedica finally provided notice of the FTC Claim to OneBeacon on January 13, 2011, well after the 09/10 Policy's 90-day Claim reporting period had expired on December 27, 2010. (*Id.*, ¶ 29).

## The 10/11 Policy

OneBeacon issued Management Liability Policy No. MML-00320-10 (the 10/11 Policy) to ProMedica for the claims-made Policy Period effective from September 29, 2010 to September 29, 2011. (*Id.*, ¶ 35). The pertinent provisions of the 10/11 Policy are essentially identical to those of the 09/10 Policy, including a similar definition of a Claim, coverage limited to Claims first made during the Policy Period, and provision for the relation back of Related Claims to the date when the earliest Related Claim was first made. (*Id.*, ¶¶ 36-41).[3] The 09/10 Policy and the 10/11 Policy are referred to collectively as the "Policies."

## ARGUMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Insurance coverage disputes, which require the interpretation of contract terms, are particularly well suited for summary disposition. *See, e.g., Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421-22 (6th Cir. 2008) (holding that summary judgment on issues of contract interpretation,

---

[3] However, unlike the 09/10 Policy, the 10/11 Policy includes a "Fully Non-Rescindable Endorsement," which provides that OneBeacon "shall not be entitled under any circumstances to void, whether by rescission or otherwise, the [Policy's D&O Coverage]." (*Id.*, ¶42).

which are ordinarily considered to be matters of law, is appropriate when the language of the contract is unambiguous).

In Ohio,[4] "construction of an insurance contract is a matter of law to be determined by the court." *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F. Supp. 2d 703, 706 (N.D. Ohio 2010) (citations omitted). In interpreting the contract, the court is to give effect to the intent of the parties to the agreement. *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219, 797 N.E.2d 1256, 1261 (2003). In doing so, the court "examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Id.* Further, the court looks to "the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Id.* "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.* "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* Only where a contract provision allows for more than one reasonable interpretation is it ambiguous and subject to strict construction against the insurer. *See King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208, 211, 519 N.E.2d 1380, 1383 (1988).

OneBeacon seeks judgment in this case on purely legal grounds based on facts of record that are not in dispute. Specifically, pursuant to the subject Policies' express and unambiguous claims-made and reporting requirements, there is no coverage for the FTC Claim under either of the Policies.

---

[4] A federal court sitting in diversity will apply the choice of law rules of the forum state or district. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "It is well-settled in Ohio that in cases involving a contract, the law of the state where the contract is made governs interpretation of the contract." *Nationwide Mut. Ins. Co. v. Ferrin,* 21 Ohio St. 3d 43, 44, 487 N.E.2d 568, 569 (1986). The parties agree that Ohio law controls the interpretation of the OneBeacon Policies because they were purchased by and delivered to ProMedica in Ohio.

It is beyond dispute that the OneBeacon Policies are "claims-made" policies. "The very essence of a claims-made policy requires the claim to be first made during the policy period." *Mueller v. Taylor Rental Ctr.*, 106 Ohio App. 3d 806, 810, 667 N.E.2d 427, 429 (1995). In addition, "[u]nder a claims-made policy, coverage exists only when the insured presents a claim to the insurer within the policy period, or an extended period as allowed under the policy." *Asp v. Ohio Med. Transp., Inc.*, No. 00AP-958, 2001 WL 721854, at *3 (Ohio Ct. App. June 28, 2001); *see also Mueller*, 106 Ohio App. 3d at 810, 667 N.E.2d at 429 ("If the insured does not give notice within the contractually required time period . . . there is simply no coverage under the policy."). Under a claims-made policy, the notice provision "'is a requirement that goes to the very essence of an insurance contract.'" *Elkins v. Am. Int'l Special Lines Ins. Co.*, 611 F. Supp. 2d 752, 762 (S.D. Ohio 2009) (citations omitted).

"The reason the insurance industry went to claims-made policies is to clearly define the period for which they were liable rather than to be liable indefinitely for an occurrence which may have occurred years before." *Mueller*, 106 Ohio App. 3d at 811, 667 N.E.2d at 430. "'The obvious advantage to the underwriter issuing 'claims made' policies is the ability to calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point, usually the policy termination date. This may result in lower rates for the insured.'" *Id.* (citations omitted); *Trice v. Employers Reins. Corp.*, 124 F.3d 205, 1997 WL 449736, at *3, n.2 (7th Cir. July 28, 1997) ("A 'claims made' policy is less expensive than an 'occurrence' policy, because it covers a definite, rather than indefinite, period of time. Thus, an insured who purchases a 'claims made' policy [] gets less extensive coverage in exchange for smaller premiums-with the corresponding risk that, if the insured does not police potential claims carefully, it may find itself without coverage."). Because compliance with a claims-made

policy's notice provision is a condition precedent to coverage, and because the predictable coverage termination date is integral to the insurer's calculation of premium rates, to allow coverage for claims that were not first made during the policy period and timely reported to the insurer in accordance with the policy provisions "would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed." *A.C. Strip*, 868 F.2d at 187.

As discussed in greater detail below, the FTC Claim was first made during the 09/10 Policy Period. Consequently, there is no coverage under the 10/11 Policy for the FTC Claim because the Claim was *not* first made in that Policy Period. Further, the 09/10 Policy's notice provisions afforded ProMedica ample time after the Policy's expiration – until December 27, 2010 – to report the FTC Claim. ProMedica's failure to timely report the FTC Claim in accordance with the 09/10 Policy's unambiguous terms precludes coverage under that Policy. Accordingly, OneBeacon owes no coverage obligations to ProMedica in response to the FTC Claim.

## I. THE FTC CLAIM WAS FIRST MADE DURING THE 09/10 POLICY PERIOD

In August 2010, during the 09/10 Policy Period, the FTC (1) commenced a "full" investigation against ProMedica that authorized the use of compulsory process in aid of that investigation; (2) issued subpoenas and CIDs to ProMedica that demanded the production of documents and the provision of testimony under oath in investigational hearings; and (3) demanded a Hold Separate Agreement from ProMedica that would maintain the *status quo* between ProMedica and St. Luke's so that the FTC would not have to immediately initiate a civil action for an injunction while its investigation was still ongoing. These events, separately or in combination, constitute a Claim under the 09/10 Policy as either "a written demand for . . . non-monetary or injunctive relief" or an "administrative [or] regulatory . . . proceeding for . . . non-

monetary . . . relief commenced by . . . the filing of a . . . formal investigative order or similar document" against "an Insured for a Wrongful Act." (SSUF ¶ 6).

A.   **The FTC's "Full" Investigation And Its Resolution Authorizing The Use Of Compulsory Process Was An Administrative Or Regulatory Proceeding For Non-Monetary Relief Commenced By A Formal Order Of Investigation**

In August 2010, the FTC sent ProMedica a letter stating that the FTC had determined to initiate a "full-phase" investigation of the Acquisition and the FTC issued the Resolution, describing the "Nature and Scope of Investigation" as follows:

> To determine whether the proposed [Acquisition] violates Section 5 of the [FTC] Act . . . ; to determine whether the [Acquisition], if consummated, would be in violation of Section 7 of the Clayton Act, . . . or Section 5 of the [FTC] Act. . . ; and to determine whether the requirements of Section 7A of the Clayton Act . . . have been or will be fulfilled with respect to said [Acquisition].

> The [FTC] hereby resolves and directs that any and all compulsory process available to it be used in connection with this investigation.

(*Id*., ¶¶ 17-18).  Pursuant to the Resolution, the FTC served ProMedica with subpoenas and CIDs requiring it to produce documents and provide testimony under oath in investigational hearings. An examination of the FTC's investigatory policies and procedures and relevant case law demonstrates that the FTC's August 2010 letter and Resolution fall squarely within the Policies' definition of a Claim.

FTC investigations generally fall into two broad categories: "initial phase" and "full" investigations.  "The initial phase of an investigation consists of the development of sufficient facts and data regarding possible violations required for a determination either that no further action is warranted or that authorization should be sought for continuation of the investigation beyond the initial phase."  FTC Operating Manual § 3.2.1.  Compulsory process is not ordinarily utilized and facts and data must be obtained through "voluntary procedures."  *Id*. at § 3.2.3.2.

In contrast, in connection with an FTC staff request to commence a "full" investigation, or after approval of such request, the FTC staff may also request a resolution authorizing the use of compulsory process. *See id.* at § 3.3.6.7.3. Only after such a resolution is issued can the FTC serve investigational subpoenas and CIDs. *Id.* at § 3.3.6.7.5.1. Those subpoenas and CIDs are "enforceable in federal court and penalties may be invoked for failure to comply." *Id.* at § 3.3.6.7.1. In addition, the use of subpoenas or CIDs "contemplates the convening of an investigational hearing with testimony under oath . . . ." *Id.* at § 3.3.6.7.5.1.

The FTC's distinctions between "initial phase" and "full" investigations demonstrate that a "full" investigation, which includes the issuance of subpoenas and CIDs and the conduct of investigatory hearings on the record, is an administrative or regulatory proceeding seeking relief in the form of document production and testimony under oath. Courts analyzing policy terms comparable to those used in the Policies have so held.

For example, in *National Stock Exchange v. Federal Insurance Co.*, No. 06-cv-1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007), the SEC sent a letter to the insured indicating that it was conducting an investigation concerning the insured's regulatory programs for equity trading and requesting documents from the insured. *Id*. at *1. Thereafter, the SEC issued an "Order Directing Private Investigation and Designating Officers to Take Testimony." *Id.* The court considered whether the SEC Order was a "Claim" under a policy that defined a "Claim" as "a formal administrative or regulatory proceeding commenced by the filing of a . . . *formal investigative order*, or similar document." *Id.* at *3 (emphasis in original). The court held that this policy language clearly demonstrated that "a formal investigation was intended to be included in the definition of 'Claim.'" *Id.* Further, the court had "no difficulty concluding that the policy [term] 'formal investigative order or similar document' includes [the] SEC [O]rder

. . . ." *Id.* Finally, the court rejected the contention that the SEC Order did not constitute a "Claim" because it was not "against an Insured Person for a Wrongful Act[,]" where the Order stated only that "the SEC had information tending to show that [the insured] *may* have committed securities violations." *Id.* at *4-5 (emphasis in original). The court highlighted the specific potential violations outlined in the SEC Order and held that because the definition of "Wrongful Act" included acts "allegedly committed or attempted" by an insured, that definition necessarily included wrongful acts that "*may have been* committed" by the insured. *Id.* at *5 (emphasis in original).

Likewise, in *Ace American Insurance Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008), the court considered "whether the issuance of the Subpoena and Investigative Demand constitute a filing of an investigative order or similar document commencing a 'civil, administrative or regulatory investigation'" so as to constitute a claim under the subject insurance policy. *Id.* at 796. The court surveyed cases from other jurisdictions and observed that they "suggest[] that Subpoenas and Investigative [D]emands may constitute Claims where they are issued by government investigative agencies related to an investigation of an insured." *Id.* The court also rejected the contention that the subpoena and investigative demand at issue could not constitute a claim because neither document alleged a "Wrongful Act." *Id.* The court explained that "the purpose of the Subpoena and [ ] Demand is to investigate potential violations of [state law]," and correspondence exchanged between the parties made clear that the subpoena was issued "because the Office of the Attorney General is concerned that certain business practices criticized by the United States Senate . . . are still being practiced by [the insured]." *Id.* at 797 (quotation omitted).

The same is true here.  The FTC's letter to ProMedica regarding its commencement of a "full" investigation, the Resolution, and the subpoenas and CIDs issued pursuant to the Resolution demonstrate that the FTC's purpose was to investigate potential violations of federal antitrust laws by ProMedica through the Acquisition.  In addition, much like the definition at issue in *National Stock Exchange*, the Policies define a Wrongful Act to include "*any actual or alleged* act, error, omission . . ." or an "Antitrust Violation," which is similarly defined to include "*actual or alleged*" violations of antitrust laws.  (SSUF ¶¶ 8-9 (emphasis added)).  Accordingly, the FTC's investigation was an administrative or regulatory proceeding for non-monetary relief from ProMedica in the form of documents and testimony for alleged violations of federal antitrust laws commenced by a formal order of investigation or similar document, rendering the FTC's full investigation a Claim under the Policies.

**B.    The FTC's Subpoenas And CIDs Were Written Demands For Non-Monetary Relief**

In differentiating between mere requests for information and demands for relief, courts examine the identity of the requesting party and the seriousness of the request.  *See, e.g.*, *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, Case No. 03 C 6067, 2004 WL 603482, at *7 (N.D. Ill. Mar. 22, 2004) (distinguishing the government-issued subpoenas at issue from mere information requests because the party making the request was a federal agency with investigatory authority and the ability to enforce its demands); *Richardson Elecs., Ltd. v. Fed. Ins. Co.*, 120 F. Supp. 2d 698, 701 (N.D. Ill. 2000) ("[C]haracterizing a [U.S. Department of] Justice [antitrust] investigation as involving a 'request' for information understates the seriousness of what such an investigation involves.").

The seriousness of the FTC's subpoenas and CIDs is demonstrated by the nature and scope of its investigatory powers and its ability to enforce its demands with the threat of fines

and imprisonment for failure to comply. The FTC is statutorily authorized to conduct investigations into various potential antitrust violations and unfair or deceptive practices. *See, e.g.*, 15 U.S.C. § 46(a); *id.* at § 57b-1(c)(1). The FTC also has the power to "require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation." *Id.* at § 49; *see also id.* at §57b-1(c)(1) (authorizing the use of CIDs in aid of investigations). In addition, the FTC may petition a United States District Court for an order enforcing its subpoenas or CIDs, as it did against ProMedica. *Id.* at § 50. The failure to comply with such an order is punishable by fines and/or imprisonment. *Id.*

Thus, the subpoenas and CIDs the FTC served upon ProMedica were substantial demands for compliance by a federal agency with the ability to enforce its demands. As such, they are not mere requests for information, but rather, written demands for non-monetary relief in the form of testimony and document production that satisfy the Policies' definition of Claim. *See Ace Am. Ins. Co.*, 570 F. Supp. 2d at 797 (holding that a subpoena and CID were "claims" and not mere requests for information because they "indicate[d] that [the insured] is a target of the investigation, not simply a source of information"); *Dan Nelson Auto. Grp., Inc. v. Universal Underwriters Grp.*, No. Civ. 05-4044, 2008 WL 170084, at *5 (D.S.D. Jan. 15, 2008) (holding that CIDs issued by the State Attorney General were claims because the CIDs "functioned to command the [insureds] to produce documents and provide information relevant to the alleged violation of statutes"); *Richardson Elecs., Ltd.*, 120 F. Supp. 2d at 701 (holding that subpoenas issued by the Department of Justice in connection with an antitrust investigation were covered "claims").

## C.    The FTC's Demand For A Hold Separate Agreement Was A Demand For Non-Monetary Or Injunctive Relief

In August 2010, the FTC also sent ProMedica a written demand that ProMedica "agree to certain limited constraints on its operations of [St. Luke's] . . . following consummation of the [Acquisition]." (SSUF ¶ 24). Pursuant to the terms of the Hold Separate Agreement, which ProMedica entered into on August 18, 2010, ProMedica agreed that it would maintain the *status quo* of St. Luke's as a separate entity after consummation of the Acquisition, by, *inter alia*, "maintain[ing] the viability, competitiveness, and marketing ability of St. Luke's; not sell[ing] or transfer[ing] any assets of St. Luke's other than in the ordinary course of business; and not caus[ing] or permit[ing] the destruction, removal, wasting, or deterioration, or otherwise impair[ing] the viability, competitiveness or marketability of St. Luke's." (*Id.*, ¶¶ 24-25).

Although the FTC did not commence litigation seeking a formal injunction at that time, the FTC clearly demanded specific non-monetary or injunctive relief from ProMedica. Further, the FTC indicated that unless ProMedica entered into the Hold Separate Agreement, the FTC would have to immediately commence an action seeking to enjoin the Acquisition. Moreover, ProMedica's entry into the Hold Separate Agreement prevented the occurrence of any antitrust injury that might have resulted from the consummation of the Acquisition, making it the functional equivalent of an agreement to toll the statute of limitations because, without any injury, no claims could accrue and no statute of limitations would begin to run. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (antitrust cause of action "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business"). Thus, because the FTC's demand for a Hold Separate Agreement was a "written demand for . . . non-monetary or injunctive relief (including any request to toll or

waive any statute of limitations),'" it is a Claim that was made in August 2010, during the 09/10 Policy Period.

## II.  THE 09/10 POLICY DOES NOT AFFORD COVERAGE FOR THE FTC CLAIM BECAUSE PROMEDICA DID NOT REPORT THE CLAIM TO ONEBEACON WITHIN THE POLICY'S CLAIM REPORTING PERIOD

The 09/10 Policy is a "claims-made" policy.  As such, the notice provisions contained therein are essential terms of the contract.  *See, e.g., Elkins*, 611 F. Supp. 2d at 762.  The 09/10 Policy's D&O Coverage required ProMedica to report any Claim first made during the Policy Period to OneBeacon "in no event later than ninety (90) days after the expiration of the Policy Period."  (SSUF ¶ 4).  Because the 09/10 Policy Period expired on September 29, 2010, ProMedica was required to report any Claim first made during that Policy Period no later than December 27, 2010.  ProMedica undeniably did not report the FTC Claim before December 27, 2010.  Accordingly, there is no coverage for the Claim under the 09/10 Policy. *See, e.g.*, *A.C. Strip.*, 868 F.2d at 187 (late notice precluded coverage under claims-made policy as a matter of law); *Elkins*, 611 F. Supp. 2d at 762 (same); *Asp*, 2001 WL 721854, at *3 (same); *Mueller*, 106 Ohio App. 3d at 810, 667 N.E.2d at 427 (same).

## III.  THE 10/11 POLICY DOES NOT AFFORD COVERAGE FOR THE FTC CLAIM BECAUSE THE CLAIM WAS FIRST MADE DURING 09/10 POLICY PERIOD

The 2010 Policy only affords coverage for Claims that are "*first made* against [ProMedica] *during the Policy Period . . . .*," which commenced on September 29, 2010.  (SSUF ¶ 36 (emphasis added)).  The FTC Claim, however, was first made in August 2010, and therefore the 10/11 Policy cannot afford coverage for the FTC Claim.

The FTC's administrative and civil actions filed in January 2011 were a mere progression of the FTC Claim that commenced in August 2010 with the FTC's full investigation and its related Resolution.  *See, e.g.*, *American Ctr. for Int'l Labor Solidarity v. Fed. Ins. Co.*, 518 F.

Supp. 2d 163, 173-74 (D.D.C. 2007) (holding that insured's failure to provide insurer with notice of EEOC investigation precluded coverage for subsequent litigation); *see also C.V. Perry & Co. v. Jefferson*, 110 Ohio App. 3d 23, 27, 673 N.E.2d 613, 616 (1996) (holding that where a second lawsuit filed after the expiration of the policy period was a continuation of an earlier suit filed during policy period, the insurer was obligated to cover second suit as part of an ongoing covered dispute).

Moreover, even if the FTC litigation were not a mere continuation of, and therefore part of, the same Claim as the FTC investigation, it still cannot be covered under the 10/11 Policy because the two matters, at a minimum, are "Related Claims" that must be treated as a single Claim first made on the date the earliest Claim was made. (SSUF ¶¶ 40-41). As discussed above, the Policies broadly define "Related Claims" to include "all Claims . . . arising out of, directly or indirectly resulting from . . . or in any way involving the same or related facts, circumstances, situations, transactions or events . . . whether related logically, causally or in any other way." (*Id.*, ¶¶ 10, 40) Because the FTC investigation and the resulting litigation both arise out of ProMedica's Acquisition of St. Luke's, they are a single Claim first made in August 2010, when the FTC commenced its full investigation. *See, e.g.*, *A.C. Strip*, 868 F.2d at 189-90 (lawsuit against law firm related back to earlier claim against a partner); *Westport Ins. Corp. v. Coffman*, No. C2-05-1152, 2009 WL 243096, at *6-9 (S.D. Ohio Jan. 29, 2009) (malpractice claim related back to earlier class action claim).

Thus, whether the FTC litigation is part of the FTC investigation Claim or is a Related Claim, there is but one Claim, the FTC Claim, which was first made in August 2010. Because the FTC Claim was not first made between September 29, 2010 and September 29, 2011, it is not covered under the 10/11 Policy.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff/Counter-Defendant Employer's Fire Insurance Company's motion for summary judgment should be granted.

Dated: August 12, 2011                                Respectfully submitted,


                                                      /s/ Julie L. Juergens
                                                      Julie L. Juergens (0066873)
                                                      GALLAGHER SHARP
                                                      1501 Euclid Avenue
                                                      6th Floor
                                                      Cleveland, OH  44115
                                                      Tel:  (216) 522-1372
                                                      Fax: (216) 241-1608
                                                      jjuergens@gallaghersharp.com

                                                           - and -

                                                      Thomas J. Judge (*pro hac vice*)
                                                      April H. Gassler (*pro hac vice*)
                                                      THOMPSON, LOSS & JUDGE, LLP
                                                      1133 21st Street, NW
                                                      Suite 450
                                                      Washington, DC 20036
                                                      Tel:  (202) 778-4060
                                                      Fax: (202) 778-4099
                                                      tjudge@tljlaw.com
                                                      agassler@tljlaw.com


                                                      *Attorneys for Plaintiff/Counter-Defendant Employers' Fire Insurance Co.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1(f), the undersigned hereby certifies that this case has been assigned a standard track and complies with the twenty (20) page limitation applicable to memoranda relating to dispositive motions in standard track cases.

/s/ Julie L. Juergens
Julie L. Juergens (0066873)