# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| Employer's Fire Insurance Company, | Case No. 3:11-cv-00923-JZ |
| Plaintiff, | Judge Zouhary |
| v. | |
| ProMedica Health System, Inc. | |
| Defendant. | |

## PROMEDICA'S MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Joseph W. Montgomery, III
jwmontgomery@jonesday.com
Matthew R. Divelbiss
mrdivelbiss@jonesday.com
JONES DAY
500 Grant Street – Suite 4500
Pittsburgh, PA 15219-2514
Phone: (412) 391-3939
Facsimile: (412) 394-7959

Of Counsel:

Marshall A. Bennett, Jr.
Jennifer J. Dawson
Marshall & Melhorn, LLC
Four SeaGate, Eighth Floor
Toledo, Ohio 43604
Phone: (419) 249-7100
Facsimile: (419) 249-7151
Bennett@marshall-melhorn.com

*Counsel for Defendant*
*ProMedica Health System, Inc.*

Dated: August 12, 2011

TABLE OF AUTHORITIES .................................................................................................... ii

I.      THE ISSUES ......................................................................................................... 1

II.     SUMMARY OF THE ARGUMENT ..................................................................... 1

III.    THE POLICIES' REQUIREMENTS FOR THE EXISTENCE OF A CLAIM ............... 2

IV.     FACTS .................................................................................................................. 4

        A.      The FTC Investigation of the St. Luke's Acquisition ............................... 4

                1.      The Informal Investigation .......................................................... 4

                2.      The Formal Investigation and the Hold Separate Agreement ................... 5

                3.      The Subpoenas and Civil Investigative Demands ..................... 6

                4.      The Complaints ............................................................................ 7

        B.      ProMedica Seeks Coverage from OneBeacon for the Defense of the
                Complaints .............................................................................................. 8

V.      ARGUMENT ...................................................................................................... 10

        A.      The Interpretation of Insurance Policies .............................................. 10

        B.      The FTC's Investigation in August 2010 Was Not a Claim ................ 10

                1.      The Formal Investigative Order Does Not Satisfy Each of
                        OneBeacon's Requirements for a Claim ................................... 11

                2.      The Hold Separate Agreement Does Not Satisfy Each of
                        OneBeacon's Requirements for a Claim ................................... 12

                3.      The Subpoenas and Civil Investigative Demands Do Not Satisfy
                        Each of OneBeacon's Requirements for a Claim ..................... 13

        C.      The January 6, 2011 Administrative Complaint Was the First Claim ................ 16

        D.      The Known Loss Defense Does Not Bar Coverage ............................... 17

        E.      OneBeacon's Estoppel Claim Fails Because OneBeacon Cannot Satisfy
                the Elements of Estoppel and OneBeacon's Policy is Non-Rescindable ............ 18

VI.     CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Andersen v. Highland House Co.,* 93 Ohio St. 3d 547, 549,
2001 Ohio 1607, 757 N.E.2d 329 (2001)...............................................................................10

*Buckeye Ranch, Inc v. Northfield Ins. Co.,*
839 N.E.2d 94 (Ohio Ct. Com. Pl. 2005)..............................................................................17

*Center for Blood Research, Inc. v. Coregis Ins. Co.,*
305 F.3d 38 (1st Cir. 2002)....................................................................................................14

*Cont'l Cas. Co. v. Auto Plus Ins. Agency, LLC,*
676 F. Supp. 2d 657 (N.D. Ohio 2009).................................................................................10

*Dealers Dairy Prods. Co. v. Royal Ins. Co.,*
170 Ohio St. 336, 164 N.E.2d 745 (1960) ............................................................................10

*Fed. Ins. Co. v. Ill. Funeral Director's Assoc.,*
No. 09 C 1634, 2010 WL 5099979 (N.D. Ill. Dec. 8, 2010) ................................................14

*King v. Nationwide Ins. Co.,* 35 Ohio St.
3d 208, 211, 519 N.E.2d 1380 (1988)...................................................................................10

*Marks v. Swartz,*
882 N.E.2d 924 (Ohio Ct. App. 2007)...................................................................................20

*MBIA, Inc. v. Fed. Ins. Co.,*
---F.3d ---, 2011 WL 2583080 (2d Cir. July 1, 2011).....................................................11, 12

*Minuteman Int'l, Inc. v. Great Am. Ins. Co.,*
No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) ................................................14

*Mosser Constr., Inc. v. Travelers Indem. Co.,*
665 F. Supp. 2d 875 (N.D. Ohio 2009).............................................................................10, 13

*Neal-Pettit v. Lahman,* 2010-Ohio-1829,
928 N.E.2d 421 (Ohio 2010) ...........................................................................................10, 13

*Office Depot, Inc. v. National Union Fire Insurance Co.,*
734 F. Supp. 2d 1304 (S.D. Fla. 2010) ..............................................................................3, 14

*Shear v. W. Am. Ins. Co.,*
464 N.E.2d 545 (Ohio 1984) .................................................................................................12

PII-1237335v2

*Smith v. Safe Auto Ins. Co.,* 2008-Ohio-5806,
    901 N.E.2d 298 (Ohio Ct. App. 2008) .......................................................................18

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,*
    73 F.3d 1178 (2d Cir. 1995) ....................................................................................17

**OTHER AUTHORITIES**

MERRIAM-WEBSTER'S ONLINE DICTIONARY ...............................................................12

OXFORD ENGLISH DICTIONARY (2d ed. 1989) ...........................................................13

PII-1237335v2

# I.     THE ISSUES

This is an insurance coverage dispute that involves two claims-made insurance policies sold by Employer's Fire ("OneBeacon") to ProMedica.  This dispute presents issues regarding: (1) what constitutes a Claim under the specific requirements of the OneBeacon policies; and (2) whether ProMedica is equitably estopped from seeking coverage because it failed to disclose the St. Luke's acquisition on its application, even though OneBeacon was otherwise made aware by ProMedica of the St. Luke's acquisition before the issuance of the relevant policy.

# II.     SUMMARY OF THE ARGUMENT

The parties do not dispute that there is a Claim as that term is defined in the policies, but they disagree as to when a Claim first occurred.  ProMedica's position is that the first Claim occurred on January 6, 2011 (during the period of its 10/11 claims-made policy sold by OneBeacon) when the FTC filed an administrative complaint against ProMedica alleging that ProMedica's acquisition of St. Luke's Hospital violated certain antitrust laws and seeking several kinds of relief (including divestiture).  As will be demonstrated below, this was the first event that satisfied each of the requirements for a Claim, including, most significantly, an allegation of a Wrongful Act and a request for relief.  ProMedica sought a defense from OneBeacon on January 13, 2011.

OneBeacon denied coverage, arguing that a related Claim had occurred earlier, sometime in August 2010 (during the period of the 09/10 claims-made policy that OneBeacon sold to ProMedica) as a result of one of three events:  (1) when the FTC commenced a formal investigation of the St. Luke's acquisition; (2) when the FTC sought a Hold Separate Agreement from ProMedica; or (3) when the FTC issued subpoenas and Civil Investigative Demands.  According to OneBeacon, if one of these three events constituted a "Claim," ProMedica had to provide notice to OneBeacon under the terms of the 09/10 Policy no later than December 27,

2010, and ProMedica's notice on January 13, 2011 was 17 days too late. OneBeacon asserts no prejudice as a result of the timing of this notice. OneBeacon asserts no motive on the part of ProMedica to withhold notice of Claim or any advantage to ProMedica to do so. It is obvious that until January 6, 2011, ProMedica did not perceive that a Claim had been made against it that could implicate its insurance coverage.

In addition to disputing when a Claim occurred, OneBeacon contends that ProMedica is estopped from seeking coverage because ProMedica failed to disclose the St. Luke's acquisition on its 10/11 D&O application. OneBeacon's estoppel claim fails because ProMedica's broker informed OneBeacon's underwriter of the St. Luke's acquisition prior to the issuance of the 10/11 Policy. Thus, OneBeacon cannot establish the actual, good-faith reliance necessary to support an estoppel claim under Ohio law. Moreover, OneBeacon agreed to an endorsement to the 10/11 D&O policy stating that it is non-rescindable *for any reason*. OneBeacon is using an estoppel defense to attempt to rescind coverage despite its agreement not to do so.

## III.    THE POLICIES' REQUIREMENTS FOR THE EXISTENCE OF A CLAIM

The relevant facts must be read in light of the requirements for a Claim. OneBeacon alleges that the there was a Claim in August 2010 that fits within subparagraph (2) of the Claim definition and ProMedica disputes that assertion.[1] Both the 09/10 Policy and the 10/11 Policy define a Claim in pertinent part as follows:

> (2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by:
> (a)    the service of a complaint or similar pleading;
> (b)    the return of an indictment, information or similar document (in the case of a criminal proceeding); or
> (c)    the filing of a notice of charges, formal investigative

---

[1] *See* Complaint ¶38 ("The 2010 Policy defines Claim, in pertinent part, as a 'civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by . . . the filing of a notice of charges, formal investigative order or similar documents.").

order or similar document,

against an Insured for a Wrongful Act; . . .

Stip. Facts ¶1 (Ex. 1, STIP 34), ¶2 (Ex. 2, STIP 106). Broken into its parts, Subparagraph (2) has

five specific requirements that must be met:

> (1) there must be an administrative or regulatory proceeding;

> (2) that proceeding must be commenced by the service of a complaint or the filing of a formal investigative order;

> (3) that proceeding must seek monetary, non-monetary or injunctive relief;

> (4) it must be against an Insured; *and*

> (5) it must be for a Wrongful Act, which the policies define to include an "actual or alleged . . . violation of . . . the Clayton Act . . . [or] the Federal Trade Commission Act."[2]

However, as of August 2010 and prior to the inception of the 10/11 Policy, at the very least

requirement (3) was missing, and requirement (5) was affirmatively refuted by the FTC

documents. There is no Claim under the Policy's definition until January 6, 2011.

There is no standard definition of a Claim under a D&O policy. For example, in *Office

Depot, Inc. v. National Union Fire Insurance Co.*, 734 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010),

the policy defined Claim as both "a civil, criminal, administrative, regulatory or arbitration

proceeding for monetary, non-monetary or injunctive relief" and separately as "a civil, criminal

or administrative or regulatory investigation of an Insured Person . . . after service of a subpoena

on such Insured Person." Unlike the OneBeacon policy, the policy in *Office Depot* had a claim

---

[2] A Wrongful Act includes an Antitrust Violation, which is defined as follows: "'Antitrust Violation' means any actual or alleged: price fixing (including horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment); restraint of trade; monopolization; or violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1936, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, ordinance, regulation or common law." Stip. Facts. ¶1 (Ex. 1, STIP 34), ¶2 (Ex. 2, STIP 106).

definition that did not require a request for relief. Different policies have different requirements, and OneBeacon chose to include five requirements in its definition of a Claim. This motion focuses on two of the five requirements. As the facts show, at no time prior to the 10/11 Policy period did the FTC allege a Wrongful Act or seek monetary, non-monetary or injunctive relief.[3] Those final two requirements were not present until the FTC filed its administrative complaint on January 6, 2011 (during the 10/11 Policy period).

## IV. FACTS

### A. The FTC Investigation of the St. Luke's Acquisition

The facts are straightforward. ProMedica entered into an agreement to acquire St. Luke's. Stip. Facts ¶4. Following that agreement, the FTC began an investigation into the acquisition of St. Luke's.

### 1. *The Informal Investigation*

The FTC sent ProMedica's counsel a letter dated July 15, 2010 stating that the FTC was "conducting a non-public preliminary investigation to determine whether the acquisition of St. Luke's by ProMedica may be anticompetitive and in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, or Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45." Stip. Facts ¶5 (Ex. 3, STIP 136). Besides requesting that ProMedica preserve documents, the letter also advised that "if at the conclusion of the investigation the Commission determines that ProMedica's acquisition of St. Luke's would have anticompetitive effects, the Commission may seek a preliminary injunction blocking or rescinding consummation of that transaction." *Id*. The FTC sought "a commitment from ProMedica that it [would] defer closing

---

[3] To the extent that OneBeacon contends that Subparagraph 1 of its Claim definition applies, that definition has four requirements: (1) a written demand; (2) for monetary, nonmonetary or injunctive relief; (3) against an Insured; and (4) for a Wrongful Act. None of the events in August 2010 satisfies the second or fourth requirements.

of its acquisition of St. Luke's while the Commission conduct[ed] its investigation." *Id.* (Ex. 3, STIP 137).

The next day, the FTC sent another letter seeking specific information. That letter states:

> The U.S. Federal Trade Commission ("Commission") is conducting a non-public investigation of the above-referenced transaction to determine whether the transaction ("acquisition") may substantially lessen competition and thereby violate Section 7 of the Clayton Act, 15 U.S.C. § 45. To assist us in this investigation, we request that ProMedica Health System, Inc. ("ProMedica"), voluntarily submit copies of the relevant information and documents described below.
>
> *Neither this letter nor the existence of this non-public investigation should be construed as indicating that a violation has occurred or is occurring. The purpose of this request is to help Commission staff determine whether further investigation of the acquisition is necessary . . . .*

Stip. Facts ¶6 (Ex. 4, STIP 138) (*emphasis* added). The FTC expressly stated that it was not alleging a wrongful act on the part of ProMedica. ProMedica then met with and provided information to the FTC. Stip. Facts ¶¶7,8.

## 2. *The Formal Investigation and the Hold Separate Agreement*

On August 6, 2010, the FTC advised ProMedica that "the FTC's investigation is transitioning to full-phase, and we expect the Commission to authorize compulsory process shortly." Stip. Facts ¶9 (Ex. 6, STIP 149). In that same letter, the FTC requested that ProMedica "continue discussions" regarding a hold-separate agreement "to maintain the independent competitive viability of St. Luke's." *Id.* The FTC's reason for the hold-separate agreement was because the FTC thought the "investigation . . . is likely to extend beyond the August 27, 2010 closing date that you have agreed to." *Id.* That letter did not allege a wrongful act on the part of ProMedica.

On August 9, 2010, the Commissioners of the FTC issued a "Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation." Stip. Facts ¶10 (Ex. 7, STIP 150). The resolution, like the prior letters, did not allege any wrongdoing but instead stated that the FTC was investigating "*to determine whether*" there was any wrongdoing:

> To determine whether the proposed acquisition of St. Luke's Hospital . . . by ProMedica Health System, Inc. violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; to determine whether the aforesaid transaction, if consummated, would be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended . . .; and to determine whether the requirements of Section 7A of the Clayton Act, 15 U.S.C. § 18a, have been or will be fulfilled with respect to said transaction.

*Id.*

The next day, on August 10, the FTC sent a Hold Separate Agreement to ProMedica that ProMedica later agreed to. Stip. Facts ¶12 (Ex. 8, STIP 151-52). That agreement allowed ProMedica to close the transaction and sought to maintain the *status quo* following the closing while the FTC continued its investigation. Nowhere in the Hold Separate Agreement did the FTC allege a wrongful act on the part of ProMedica.

### 3. *The Subpoenas and Civil Investigative Demands*

On August 13, 2010, the FTC issued subpoenas seeking testimony from certain employees of ProMedica and St. Luke's. Stip. Facts ¶13. Then, on August 25, 2010, the FTC issued document subpoenas and Civil Investigative Demands not only on ProMedica, but also on St. Luke's and Paramount Health Systems. Each subpoena defined the subject of the investigation as "In the matter of the proposed Acquisition by ProMedica Health System, Inc., of St. Luke's Hospital . . . ." Stip. Facts ¶14 (Ex. 9, STIP 153), ¶15 (Ex. 10, STIP 170), ¶16 (Ex. 11, STIP 187). Each Civil Investigative Demand stated that it was issued "in the course of an investigation *to determine whether* there is, has been, or may be a violation of any laws

administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3," which refers to the "Proposed Acquisition by ProMedica Health System, Inc. of St. Luke's Hospital."  Stip. Facts ¶17 (Ex. 12, STIP 200), ¶18 (Ex. 13, STIP 220), ¶19 (Ex. 14, STIP 240) (*emphasis* added).  Neither the subpoenas nor the Civil Investigative Demands alleged that ProMedica had committed a wrongful act, but instead continued to state that the FTC was investigating "to determine whether" there were any violations.  The St. Luke's transaction closed on August 31, 2010.  Stip. Facts ¶20.  The FTC filed an action in the Northern District of Ohio on October 13, 2010—during the 10/11 Policy period—to compel compliance with the subpoenas and Civil Investigative Demands, which was amicably resolved.  Stip. Facts ¶21.  There were various discussions and document exchanges between October 2010 and January 2011.

### 4.    *The Complaints*

It was not until January 6, 2011—during the 10/11 Policy period—that the FTC filed a complaint *alleging a wrongful act* on the part of ProMedica and *seeking relief* on that basis.  Stip. Facts ¶22 (Ex. 17).   That complaint opens as follows:

> Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by the Act, the Federal Trade Commission, having reason to believe that Respondent ProMedica Health System, Inc. ("ProMedica") consummated a joinder agreement (the "Acquisition") in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint, stating its charges as follows . . .

*Id.* (Ex. 17, STIP 280).  The administrative complaint also includes a section titled, "**NOTICE OF CONTEMPLATED RELIEF**."  *Id.* (Ex. 17, STIP 290).  The next day, the FTC and the State of Ohio filed a "Complaint for Temporary Restraining Order and Preliminary Injunction" in this Court.  Stip. Facts ¶23 (Ex. 18).   The action sought "equitable relief" to "maintain the

*status quo* until resolution of the administrative proceeding." *Id.* (Ex. 18, STIP 310).   The

litigation with the FTC is ongoing.

### B. ProMedica Seeks Coverage from OneBeacon for the Defense of the Complaints

ProMedica provided notice to OneBeacon by email dated January 13, 2011, just one

week after the FTC filed the administrative complaint.  Stip. Facts ¶24 (Ex. 19).   Almost five

months after receiving notice, OneBeacon denied coverage.  Stip. Facts ¶26 (Ex. 21).

OneBeacon asserted that the first Claim was not the FTC Complaints, but instead was the FTC's

Formal Investigative Order or the Hold Separate Agreement or the documents subpoenas and

Civil Investigative Demands that occurred in August 2010.  *Id.* (Ex. 21, STIP 432-33).

According to OneBeacon, because those events took place in August 2010, a Claim actually took

place within the 09/10 Policy, instead of the 10/11 Policy under which ProMedica provided

notice.  The 09/10 Policy did not provide coverage, OneBeacon asserted, because ProMedica had

to provide notice to OneBeacon by December 27, 2010, and ProMedica's January 13 notice was

17 days too late (though OneBeacon alleged no prejudice).  And, according to OneBeacon, the

10/11 Policy did not apply because the FTC complaints were "not a Claim that was first made

during the 2010[-2011] Policy Period."  *Id.* (Ex. 21, STIP 433).  OneBeacon also alleged that

because a Claim occurred in August 2010, it was a known loss when the 10/11 Policy incepted.[4]

*Id.*

Alternatively, OneBeacon asserted that ProMedica failed to disclose the St. Luke's

acquisition on its 10/11 Policy application and, thus, ProMedica was equitably estopped from

obtaining coverage.  *Id.* (Ex. 21, STIP 433).  OneBeacon's litigation position apparently was

---

[4] By necessity, the known-loss defense fails if there was no Claim during the 09/10 Policy, and the defense
is moot if there was such a Claim.

taken without knowledge that Jake Clinton, the OneBeacon underwriter responsible for issuing

the 10/11 Policy, had received an email disclosing the St. Luke's acquisition on September 17,

2010:

> Please advise if you can quote $10MM X $10MM for Promedica's
> Fiduciary ($25K retention option attached).  We are still waiting
> on Promedica plan information for 2009 and the newly acquired
> St. Lukes (OhioCare Health System) plan information.
>
> I have attached the application completed this year which needs to
> be updated with St. Lukes info.  I can send you 2008 plan docs for
> Promedica if that will help.

Stip. Facts ¶29 (Ex. 25, STIP 613).   The fiduciary application attached to the email referenced

"the pending acquisition of St. Luke's Medical Center."  *Id.* (Ex. 25, STIP 616).[5]  Additionally,

the email attached the Consolidated Financial Report for St. Luke's.  *Id.* (Ex. 25, STIP 628-64).

Armed with this information, Mr. Clinton agreed to issue the excess fiduciary policy just six

days later on September 23.  Stip. Facts ¶30 (Ex. 26, STIP 665-70).  Mr. Clinton issued the

binder for the 10/11 Policy four days later on September 27.  Stip. Facts ¶30 (Ex. 24, STIP 604-

12).  OneBeacon's denial made no reference to this or to the fact that OneBeacon agreed as part

of its 10/11 Policy that OneBeacon "shall not be entitled under any circumstances to void,

whether by rescission or otherwise, the [D&O] Coverage Section."  Stip. Facts ¶2 (Ex. 2, STIP

85).[6]

The very same day that OneBeacon issued its denial letter, OneBeacon filed this

declaratory judgment action, asserting the same bases for denying coverage as set forth in its

letter.

---

[5] The application was completed and signed prior to the closing of the St. Luke's acquisition.  *Compare*
Stip. Facts ¶29 (Ex. 25, STIP 625) (dated August 13, 2010) *and* Stip. Facts ¶20 (stating that the acquisition closed
on August 31, 2010).

[6] Estoppel based on an alleged misrepresentation is merely rescission by another name.

## V.    ARGUMENT

### A.    The Interpretation of Insurance Policies

The interpretation of an insurance policy is a question of law for the Court.  An insurance policy is "a contract and like any other contract is to be given a reasonable construction in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." *Mosser Constr., Inc. v. Travelers Indem. Co.*, 665 F. Supp. 2d 875, 878 (N.D. Ohio 2009) (quoting *Dealers Dairy Prods. Co. v. Royal Ins. Co.*, 170 Ohio St. 336, 339, 164 N.E.2d 745 (1960)); *see also Cont'l Cas. Co. v. Auto Plus Ins. Agency, LLC*, 676 F. Supp. 2d 657, 662 (N.D. Ohio 2009).  "However, where provisions in a contract are reasonably susceptible of more than one meaning, they are strictly construed against the insurer." *Mosser Constr.*, 665 F. Supp. 2d. at 878-79 (quoting *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208, 211, 519 N.E.2d 1380 (1988)); *see also Cont'l Cas.*, 676 F. Supp. 2d at 662. The burden is on the insurer to "establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can be fairly placed on the language in question." *Cont'l Cas.*, 676 F. Supp. 2d at 662 (quoting *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 549, 2001 Ohio 1607, 757 N.E.2d 329 (2001)).   Where "the parties have offered their own separate interpretations of the language of the policy, both of them plausible," the Court "must resolve any uncertainty in favor of the insured." *Neal-Pettit v. Lahman*, 2010-Ohio-1829, ¶17, 928 N.E.2d 421, 424 (Ohio 2010).

### B.    The FTC's Investigation in August 2010 Was Not a Claim

OneBeacon alleges that the Claim occurred in August 2010 as a result of one of three events:  (1) the Formal Investigative Order; (2) the Hold Separate Agreement; or (3) the subpoenas and Civil Investigative Demands that the FTC served on August 25, 2010.  Complaint

¶¶17-18, 39, 58.  None of these alleges a Wrongful Act or seeks relief.  Those final two

requirements were not satisfied until the FTC filed its administrative complaint in January 2011.

      1.     ***The Formal Investigative Order Does Not Satisfy Each of OneBeacon's Requirements for a Claim***

      The Formal Investigative Order fails to satisfy each of OneBeacon's requirements for a

Claim.  The Formal Investigative Order does not contain *any* request that could be characterized

as a request for "monetary, non-monetary or injunctive relief."  *See* Stip. Facts ¶10 (Ex. 7, STIP

150).  Indeed, the Formal Investigative Order does not request *anything*.  It merely states the fact

of the investigation.

      Besides not seeking relief, the non-public Formal Investigative Order does not allege a

Wrongful Act (*i.e.*, an "actual or alleged . . . violation of . . . the Clayton Act . . . [or] the Federal

Trade Commission Act").  To the contrary, the Formal Investigative Order specifically states that

its purpose is "[t]o determine whether" any violation would occur as a result of the St. Luke's

acquisition.  *Id.*  From the beginning, the FTC advised ProMedica that "the existence of this non-

public investigation should [not] be construed as indicating that a violation has occurred or is

occurring."  Stip. Facts ¶6 (Ex. 4, STIP 138).  The Formal Investigative Order did not change

this or allege any wrongdoing on the part of ProMedica.

      Of course, the FTC could have alleged wrongful conduct as part of its investigative order.

Recently, the Second Circuit concluded that a D&O policy provided coverage for investigations

by the SEC and the New York attorney general.  *See MBIA, Inc. v. Fed. Ins. Co.*, ---F.3d ---,

2011 WL 2583080 (2d Cir. July 1, 2011).  There, the investigations began with a formal

investigative order from the SEC dated March 9, 2001.  *See id.* at *1.  That SEC order

specifically alleged wrongful conduct:

              Members of the staff have reported information to the Commission
              which tends to show that . . .[c]ertain persons or entities may have

> . . . employed devices, schemes, or artifices to defraud; . . .
> obtained money or property by means of, or otherwise may have
> made untrue statements . . . ; or . . . engaged in transactions, acts,
> practices, or courses of business which have operated as a fraud or
> deceit upon purchasers of securities or upon other persons.

*MBIA Inc. v. Fed. Ins. Co.*, Document 51-9, Case No. 1:08-cv-4313-RMB (S.D.N.Y. filed Aug.

21, 2009) (publicly available through PACER).  Unlike the investigative order in *MBIA*, the

FTC's investigative order with respect to the St. Luke's acquisition *contained no allegations of a*

*wrongful act*.  And the FTC's order did not seek any relief. [7]

### 2. The Hold Separate Agreement Does Not Satisfy Each of OneBeacon's Requirements for a Claim.

Like the Formal Investigative Order, the Hold Separate Agreement does not allege

wrongful conduct (*i.e.*, an Antitrust Violation).  In fact, it does not allege anything—there is no

mention of "antitrust," the "Clayton Act," or the "Federal Trade Commission Act."  Stip. Facts

¶12 (Ex. 8, STIP 151-52).  The FTC allowed the transaction to close, which would make no

sense if the FTC were alleging a wrongful act.  The FTC even sought an assurance that

ProMedica would provide funding to St. Luke's, if necessary.

The Hold Separate Agreement also does not seek "monetary, non-monetary or injunctive

relief" as that phrase is commonly understood.  When a term in a policy is not defined, Ohio

courts look to the dictionary definition.  *See, e.g., Shear v. W. Am. Ins. Co.*, 464 N.E.2d 545, 548-

49 (Ohio 1984) (using the dictionary definition of an undefined term to determine "its common,

ordinary, usual meaning").  *Merriam-Webster's* defines "relief" as "legal redress or remedy."

MERRIAM-WEBSTER'S ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/relief

(last visited Aug. 9, 2011).  *Oxford's* defines "relief" as "[d]eliverance (esp. in *Law*) from some

---

[7] The definition of claim that the court relied on in *MBIA* did not require a request for relief.  *See MBIA*, 2011 WL 3583080, at *5 ("A 'Securities Claim' is defined as, in relevant part, 'a formal or informal administrative or regulatory proceeding or inquiry commenced by the filing of a notice of charges, formal or informal investigative order or similar document.'").

hardship, burden or grievance; remedy; redress." 13 THE OXFORD ENGLISH DICTIONARY 565 (2d ed. 1989). Here, ProMedica's interpretation that the Hold Separate Agreement does not constitute "relief" is reasonable under both of these definitions. A request to keep St. Luke's separate for 60 days is not relief because it is not redressing or remedying anything (the FTC never alleged that the St. Luke's acquisition violated federal law), and the Hold Separate Agreement likewise is not "a deliverance from hardship, burden or grievance."

Moreover, the language of the Hold Separate Agreement shows that the FTC did not view the Hold Separate Agreement as "relief":

> Nothing in this Agreement shall be construed to limit the *type or scope of relief* the [FTC] may seek to enjoin ProMedica from exercising direction or control over St. Luke's during the pendency of any challenge to the Acquisition brought by the [FTC].

Stip. Facts ¶12 (Ex. 8, STIP 152) (*emphasis* added). In other words, the Hold Separate Agreement left open the possibility that the FTC may seek relief *in the future* (which the FTC did during the 10/11 Policy period). But the FTC did not assert that the Hold Separate Agreement was "relief." Even if OneBeacon asserts a different view, ProMedica's interpretation of the term "relief"—which it shares with the FTC—is at the very least plausible, and the Court must apply that interpretation. *See Neal-Pettit*, 2010-Ohio-1829, ¶17, 928 N.E.2d at 424 ("[I]nsofar as the parties have offered their own separate interpretations of the language of the policy, both of them plausible, we must resolve any uncertainty in favor of the insured."). The Hold Separate Agreement did not seek relief or allege a Wrongful Act.

### 3. *The Subpoenas and Civil Investigative Demands Do Not Satisfy Each of OneBeacon's Requirements for a Claim*

Likewise, the subpoenas and Civil Investigative Demands do not satisfy OneBeacon's requirements for a Claim, because they do not seek "monetary, non-monetary or injunctive relief" or allege a Wrongful Act. As previously discussed, "relief" has been variously defined as

- 13 -

"legal redress or remedy" or "the redress or benefit . . . that a party asks of a court."

ProMedica's interpretation that a subpoena does not constitute relief is reasonable and plausible

based on the common definitions of relief. Indeed, that a subpoena does not seek "relief" is a

position that insurers take, and that position has been found to be reasonable. *See Minuteman*

*Int'l, Inc. v. Great Am. Ins. Co.*, No. 03 C 6067, 2004 WL 603482, *9 (N.D. Ill. Mar. 22, 2004)

(adopting the insured's broader interpretation of relief, but holding that it was "not unreasonable

for [the insurer] to argue" that a subpoena did not seek "relief"); *see also Center for Blood*

*Research, Inc. v. Coregis Ins. Co.*, 305 F.3d 38, 43 (1st Cir. 2002) (accepting the insurer's

argument and holding that "mere compliance with the subpoena simply is not relief."). Of

course, OneBeacon could have specifically defined a subpoena as a Claim without requiring

relief (or it could have defined "relief"), but it failed to do so. *See, e.g., Office Depot*, 734 F.

Supp. at 1310.

 The subpoenas and Civil Investigative Demands also do not allege a Wrongful Act.

Indeed, the subpoenas and Civil Investigative Demands do not make any allegations. Instead,

each subpoena defined the subject of the investigation as "In the matter of the proposed

Acquisition by ProMedica Health System, Inc., of St. Luke's Hospital . . . ." Stip. Facts ¶14 (Ex.

9, STIP  153), ¶15 (Ex. 10, STIP 170), ¶16 (Ex. 11, STIP 187). Each Civil Investigative

Demand stated that it was issued "in the course of an investigation *to determine whether* there is,

has been, or may be a violation of any laws administered by the Federal Trade Commission."

Stip. Facts ¶17 (Ex. 12, STIP 200), ¶18 (Ex. 13, STIP 220), ¶19 (Ex. 14, STIP 240) (*emphasis*

added). There were no allegations that ProMedica had done anything wrong such that there

could be a Claim. *See Fed. Ins. Co. v. Ill. Funeral Director's Assoc.*, No. 09 C 1634, 2010 WL

5099979, *4 (N.D. Ill. Dec. 8, 2010) (holding that the subpoenas did not constitute a claim

because "the record shows that the Subpoenas do no allege Defendants engaged in any Wrongful Acts.").

The FTC's action filed in the Northern District on October 13, 2010 (during the 10/11 Policy period) seeking to enforce compliance with the subpoenas and Civil Investigative Demands confirms that the FTC's subpoenas and Civil Investigative Demands were not alleging a wrongful act or seeking relief.  In interpreting its own documents, the FTC stated that the FTC was "conducting an investigation *to determine whether* the transaction violates the antitrust laws . . . ."  Stip. Facts ¶21 (Ex. 16, STIP 266) (*emphasis* added).  The FTC said it was in urgent need of certain materials prior to the October 30 consolidation date because "[o]nce that consolidation has occurred, the Commission's ability *to obtain effective relief* in this matter . . . is much more difficult."  *Id.* (Ex. 16, STIP 265).  The FTC staff needed the materials to "use them to *inform a recommendation* for the Commission prior to the expiration of the hold-separate agreement."  Stip. Facts ¶21 (Ex. 15,  STIP 254) (*emphasis* added).  In other words, the FTC staff had not yet even made its recommendation to the Commission as to whether to allege a wrongful act.[8]  The FTC viewed "relief" as what it may seek in the future—*if* it alleged wrongdoing.  It is reasonable for ProMedica to adopt the same interpretation as the FTC.

Moreover, the subpoenas and Civil Investigative Demands were not issued to ProMedica alone.  Materially identical subpoenas and Civil Investigative Demands were served on Paramount Healthcare and St. Luke's.  Stip Facts ¶¶15, 16, 18, and 19.  OneBeacon's interpretation of those documents would mean that the FTC was also alleging wrongful conduct and seeking relief from St. Luke's and Paramount.  Such an interpretation does not make sense because St. Luke's and Paramount were not acquiring any entity that could result in a violation

---

[8]While it occurred during the 10/11 Policy period, even the action to enforce the subpoenas was not a Claim because failing to respond to a subpoena is not a Wrongful Act that would be covered under OneBeacon's policy.

or give the FTC grounds to seek relief against them. Instead, that the subpoenas and Civil Investigative Demands were directed at multiple entities as part of an investigation, and they were not alleging wrongful acts or seeking relief. The subpoenas and Civil Investigative Demands fail to satisfy each of OneBeacon's requirements for a Claim.

*   *   *

Had ProMedica perceived that the FTC investigation was a Claim, it would have been in ProMedica's interest to give notice to OneBeacon. The Claim would have fallen within the expired policy, leaving the limits of the new 10/11 Policy unimpaired. The fact is that ProMedica did not give notice until January 2011 because none of the prior events—the Formal Investigative Order, the Hold Separate Agreement, and the subpoenas and Civil Investigative Demands—were perceived by ProMedica to be a Claim, and they did not satisfy OneBeacon's requirements for a Claim. There was no Claim during the 09/10 Policy.

### C. The January 6, 2011 Administrative Complaint Was the First Claim

Unlike OneBeacon, ProMedica points to a single event—the January 6, 2011 administrative complaint—that satisfies each of OneBeacon's requirements for a Claim. Stip. Facts ¶22 (Ex. 17). Specifically:

- It was an administrative proceeding before the FTC.

- It was commenced by the service of a complaint on ProMedica.

- The FTC sought non-monetary and injunctive relief—the complaint had a section titled "**NOTICE OF CONTEMPLATED RELIEF**" that listed the relief that the FTC sought.

- It was against an Insured—ProMedica.

- The complaint alleged Antitrust Violations: ". . . having reason to believe that Respondent ProMedica Health System, Inc. ("ProMedica") consummated a joinder agreement (the "Acquisition") in violation of Section 7 of the Clayton Act, as amended 15 U.S.C. § 18 . . . ."

- 16 -

All five of OneBeacon's requirements for a Claim are satisfied. This Claim occurred during the 10/11 Policy, and OneBeacon acknowledges that it received notice on January 13, 2011. Complaint ¶49. As set forth above, there was no Claim during the 09/10 Policy period, so the FTC administrative complaint was a "Claim first made" during the 10/11 Policy, and OneBeacon's 10/11 Policy provides coverage for Claims that are first made during the Policy Period. Complaint ¶37. ProMedica is entitled to a declaration of OneBeacon's obligation to pay the defense of the FTC complaints in accordance with the terms of OneBeacon's 10/11 Policy.

**D.**     **The Known Loss Defense Does Not Bar Coverage**

OneBeacon's known loss/loss-in-progress theory as set forth in its complaint is premised on its allegations that "[p]ursuant to the terms of the 2009 and 2010 Policies, the FTC Claim was first made no later than August 25, 2010" and, thus, "[t]here is no coverage under the 2010 Policy for the FTC Claim because it constitutes a known loss or a loss that was in progress prior to the commencement of coverage under the 2010 Policy." Complaint ¶¶58, 60. For the reasons set forth above, there was no Claim during the 09/10 Policy because the requirements of OneBeacon's definition of Claim were not satisfied. ProMedica did not know of a Claim prior to the 10/11 Policy because there was no Claim. At most, ProMedica knew that there was a risk that there could be a Claim in the future, and "'an insured's knowledge of a *risk* of losses does not bar indemnity coverage' under the 'known loss' doctrine." *Buckeye Ranch, Inc v. Northfield Ins. Co.*, 839 N.E.2d 94, 106 (Ohio Ct. Com. Pl. 2005) (citing *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1214-15 (2d Cir. 1995)) (emphasis in original).

E.    **OneBeacon's Estoppel Claim Fails Because OneBeacon Cannot Satisfy the Elements of Estoppel and OneBeacon's Policy is Non-Rescindable**

OneBeacon also alleges that ProMedica "is equitably stopped from seeking coverage under the [10/11] Policy for the FTC Claim by reason of ProMedica's failure to disclose the Acquisition in the Renewal Application."  Complaint ¶57.  Under Ohio law:

> To show a prima facie case for application of equitable estoppel, a plaintiff must show that (1) the defendant made a factual misrepresentation, (2) that is misleading, (3) that induces actual reliance that is reasonable and in good faith, and (4) that causes detriment to the relying party.

*Smith v. Safe Auto Ins. Co.*, 2008-Ohio-5806, ¶ 28, 901 N.E.2d 298, 304 (Ohio Ct. App. 2008).

OneBeacon's claim of equitable estoppel fails because OneBeacon cannot satisfy the requirement of actual reliance that was reasonable and in good faith, and the defense violates the terms of OneBeacon's own policy.

ProMedica's 10/11 D&O application stated that it was always seeking new opportunities, but it failed to disclose the St. Luke's acquisition.[9]  Nonetheless, ProMedica did, in fact, disclose the acquisition to OneBeacon prior to OneBeacon issuing the 10/11 Policy.  Jack Clinton was OneBeacon's underwriter.  Stip Facts ¶27.  He was the most important person at OneBeacon to have the information and the person who received the application.  At the same time Mr. Clinton was working on the renewal, he was also asked by ProMedica's broker to provide excess fiduciary coverage.  Stip. Facts ¶29 (Ex. 25, STIP 613).  On September 17, 2010—10 days prior to the issuance of the D&O policy—ProMedica's broker sent the following email to Mr. Clinton:

> Please advise if you can quote $10MM X $10MM for Promedica's Fiduciary ($25K retention option attached).  We are still waiting on Promedica plan information for 2009 and *the newly acquired St. Lukes (OhioCare Health System)* plan information.

---

[9] The application did attach ProMedica's 2009 financial statements, which said:  "In January 2010, the System has entered into a memorandum of understanding related to an integrated affiliation agreement with St. Luke's Hospital, a local 300-bed hospital located in Maumee, Ohio."  Stip. Facts ¶27 (Ex. 22, STIP 479).

> I have attached the application completed this year which needs to
> be updated *with St. Lukes info*. I can send you 2008 plan docs for
> Promedica if that will help.

*Id.* The fiduciary application attached to the email specifically referenced "the pending

acquisition of St. Luke's Medical Center." *Id.* (Ex. 25, STIP 616). Additionally, the email

attached the Consolidated Financial Report *for St. Luke's*. *Id.* (Ex. 25, STIP 628-64). Six days

later, on September 23, Mr. Clinton agreed to issue the excess fiduciary policy that ProMedica

requested. Stip. Facts ¶30 (Ex. 26). Four days later—on September 27—Mr. Clinton agreed to

bind the 10/11 Policy. Stip. Facts ¶28 (Ex. 24, STIP 604-12).

OneBeacon itself states that its policies are issued "in reliance on *all* statements made and

information furnished to Underwriter." Stip. Facts ¶2 (Ex. 2, STIP 94). Here, "all statements

made and information furnished" includes the information provided to Mr. Clinton that disclosed

the St. Luke's acquisition, information he would have used to issue the excess fiduciary policy

four days *before* he issued the 10/11 Policy. OneBeacon cannot establish "actual reliance that is

reasonable and in good faith."

Moreover, OneBeacon agreed that its 10/11 Policy is non-rescindable. The policy states:

> In consideration of the premium charged, notwithstanding anything
> to the contrary contained in Section XI REPRESENTATIONS
> AND SEVERABILITY; INCORPORATION OF APPLICATION
> of the Coverage Section identified above, the Underwriter shall not
> be entitled under any circumstances to void, whether by rescission
> or otherwise, the Coverage Section identified above; provided, that
> nothing contained in this endorsement is intended, nor shall it be
> construed, to limit or waive any other rights or remedies available
> to the Underwriter.

Stip. Facts ¶2 (Ex. 2, STIP 85). The endorsement modifies the section of the Policy that states

that the Policy is issued "in reliance on the truth of" the representations in the application. In

other words, OneBeacon agreed not to rescind coverage based on the representations in the

application. Here, OneBeacon is using equitable estoppel to attempt to rescind the coverage

based on a representation in the application—*i.e.*, the failure to list the St. Luke's acquisition. OneBeacon—by the terms of its policy—has voluntarily waived its right to do so. *Marks v. Swartz*, 882 N.E.2d 924, 929 (Ohio Ct. App. 2007) ("Waiver as applied to contracts is a voluntary relinquishment of a known right.") OneBeacon's attempt to use equitable estoppel to end run its own policy provision must be rejected because it fails as a matter of law and is contrary to its own policy.

## VI.    CONCLUSION

The Claim was first made during the 10/11 Policy period. The January 6, 2011 FTC Complaint is the first event that satisfies each of OneBeacon's requirements for a Claim. While OneBeacon attempts to use equitable estoppel to avoid coverage, it cannot satisfy the required elements and it agreed not to rescind coverage based on representations in the application. For these reasons, as well as for the reasons set forth above, ProMedica is entitled to summary judgment in its favor and against OneBeacon declaring that OneBeacon has an obligation to pay for the defense of the FTC Complaints in accordance with the terms of the 10/11 Policy.

PII-1237335v2

Respectfully submitted,

_/s/ Matthew R. Divelbiss_
Joseph W. Montgomery, III
jwmontgomery@jonesday.com
Matthew R. Divelbiss
mrdivelbiss@jonesday.com
JONES DAY
500 Grant Street – Suite 4500
Pittsburgh, PA  15219-2514
Phone:  (412) 391-3939
Facsimile:  (412) 394-7959

Of Counsel:

Marshall A. Bennett, Jr.
Jennifer J. Dawson
Marshall & Melhorn, LLC
Four SeaGate, Eighth Floor
Toledo, Ohio 43604
Phone:  (419) 249-7100
Facsimile:  (419) 249-7151
Bennett@marshall-melhorn.com

*Counsel for Defendant*
*ProMedica Health System, Inc.*

Dated:  August 12, 2011

- 21 -

# LOCAL RULE 7.1(F) CERTIFICATION

This case has been assigned a standard track.  The foregoing memorandum adheres to the

20-page limit for cases assigned to the standard track, exclusive of the cover page, table of

contents, table of authorities, signature page, certification, and certificate of service.


 */s/ Matthew R. Divelbiss*
Attorney for Defendant
ProMedica Health System, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2011, a copy of foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt. Parties may access this filing through the Court's

system.

*/s/ Matthew R. Divelbiss*
Attorney for Defendant
ProMedica Health System, Inc.