# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Employers' Fire Insurance Co.,

        Plaintiff/Counter-Defendant,

   vs.

ProMedica Health System, Inc.,

        Defendant/Counter-Plaintiff.

Case No.: 3:11-cv-00923-JZ

---

**PLAINTIFF/COUNTER-DEFENDANT EMPLOYERS' FIRE INSURANCE CO.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT/ COUNTER-PLAINTIFF PROMEDICA HEALTH SYSTEM, INC.'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

Thomas J. Judge (*pro hac vice*)
April H. Gassler (*pro hac vice*)
THOMPSON, LOSS & JUDGE, LLP
1133 21st Street, NW
Suite 450
Washington, DC 20036
Tel:  (202) 778-4060
Fax: (202) 778-4099
tjudge@tljlaw.com
agassler@tljlaw.com

Julie L. Juergens (0066873)
GALLAGHER SHARP
1501 Euclid Avenue
6th Floor
Cleveland, OH  44115
Tel:  (216) 522-1372
Fax: (216) 241-1608
jjuergens@gallaghersharp.com

*Attorneys for Plaintiff/Counter-Defendant Employers' Fire Insurance Co.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.  IN AUGUST 2010, THE FTC MADE WRITTEN DEMANDS FOR NON-MONETARY
    OR INJUNCTIVE RELIEF AND COMMENCED AN ADMINISTRATIVE OR
    REGULATORY PROCEEDING FOR SUCH RELIEF THROUGH A FORMAL
    INVESTIGATIVE ORDER OR SIMILAR DOCUMENT .................................................. 3

    A.  The FTC's Full Investigation Was A Claim .................................................4

        1.  The Relevant Case Law Supports OneBeacon's Position ................................... 5

        2.  The Cases Cited by ProMedica Either Support OneBeacon's Position or
            Are Inapposite .......................................................................... 9

    B.  The FTC's Demand For A Hold Separate Agreement Is A Claim ............................12

II. THE KNOWN LOSS DOCTRINE OR EQUITABLE ESTOPPEL PRECLUDES
    COVERAGE FOR THE FTC CLAIM .................................................................. 14

    A.  ProMedica's Alleged Disclosure Of The Acquisition Does Not Preclude
        Application Of The Known Loss Doctrine To The FTC Claim ................................14

    B.  Application Of Equitable Estoppel To Preclude Coverage For The FTC Claim
        Is Not Tantamount To Rescission Of The 10/11 Policy .............................17

    C.  Pursuant To Rule 56(d), OneBeacon Requires Discovery In Order To Fully
        Respond To ProMedica's Challenge To The Known Loss and Estoppel Claims .......18

    CONCLUSION.................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Ace American Insurance Co. v. Ascend One Corp.*,
  570 F. Supp. 2d 789 (D. Md. 2008) .................................................................. 8, 10, 11

*Center for Blood Research, Inc. v. Coregis Insurance Co.*,
  305 F.3d 38 (1st Cir. 2002) ...................................................................................... 10

*Federal Insurance Co. v. Illinois Funeral Director's Association*,
  No. 09 C 1634, 2010 WL 5099979 (N.D. Ill. Dec. 8, 2010) .................................... 11

*MBIA Inc. v. Federal Insurance Co.*,
  __ F.3d __, 2011 WL 2583080 (2d Cir. July 1, 2011) ............................................... 9

*Minuteman International, Inc. v. Great American Insurance Co.*,
  No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) ............................... 7, 10

*National Stock Exchange v. Federal Insurance Co.*,
  No. 06 C 1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007) ......................... 7, 8, 10

*Office Depot, Inc. v. National Union Fire Insurance Co.*,
  734 F. Supp. 2d 1304 (S.D. Fla. 2010) ................................................................... 11

*Plott v. General Motors Corp.*,
  71 F.3d 1190 (6th Cir. 1995) ................................................................................... 20

*Polychron v. Crum & Forster Insurance Cos.*,
  916 F.2d 461 (8th Cir. 1990) ..................................................................................... 6

*Richardson Electronics, Ltd. v. Federal Insurance Co.*,
  120 F. Supp. 2d 698 (N.D. Ill. 2000) ........................................................................ 6

*United States v. A.C. Strip*,
  868 F.2d 181 (6th Cir. 1989) ..................................................................................... 1

**<u>Statutes</u>**

15 U.S.C. § 57b-1 ............................................................................................................ 5

**<u>Rules</u>**

Fed. R. Civ. P. 56(d) ..................................................................................................... 20

## INTRODUCTION

In its cross-motion for summary judgment, Defendant/Counter-Plaintiff ProMedica Health System, Inc. ("ProMedica") does not dispute that the claims-made insurance policy issued to ProMedica for the Policy Period from September 29, 2010 to September 29, 2011 (the "10/11 Policy") only affords coverage for a Claim *first* made during that Policy Period.[1]  ProMedica also does not dispute that the FTC litigation commenced in January 2011 is not covered under the 10/11 Policy *if* the FTC's full investigation against ProMedica, which commenced in August 2010, was a Claim.  This is so because the FTC litigation resulting from that investigation was either simply a continuation of that earlier Claim or, at a minimum, is a Related Claim considered by the Policy's express terms to have been first made when the full investigation commenced.  Moreover, if the FTC's full investigation was a Claim, ProMedica effectively concedes that there is no coverage for the FTC's full investigation and the resulting litigation under the earlier claims-made policy issued to ProMedica for the Policy Period from September 29, 2009 to September 29, 2010 (the "09/10 Policy"), because ProMedica undeniably did not report the Claim to OneBeacon prior to the expiration of that Policy's reporting period.[2]

The Court therefore has but one issue to resolve in addressing the parties' cross-motions for summary judgment:  Whether the FTC's full investigation against ProMedica, which included the FTC's issuance of subpoenas and civil investigative demands ("CIDs") pursuant to a formal resolution and the FTC's demand for a Hold Separate Agreement, was a "Claim" under

---

[1]Capitalized terms are defined terms in the Policy.

[2]ProMedica understandably does not challenge the well-established principle that the bargained for coverage under a claims-made policy necessarily turns in the first instance on whether the Claim is first made during the Policy Period and timely reported to the insurer.  *See, e.g.*, *United States v. A.C. Strip*, 868 F.2d 181, 187 (6th Cir. 1989) (applying Ohio law).  In light of that principle, OneBeacon need not speculate about ProMedica's motivation for not timely reporting the FTC's full investigation.  Nevertheless, in failing to disclose the investigation at the time it was applying for the 10/11 Policy, ProMedica may well have hoped that the FTC investigation would have passed without further proceedings and correctly believed that disclosure would have adversely affected the premium for and scope of coverage provided by the 10/11 Policy and future policies.

the 09/10 Policy?  The question is readily resolved by applying the Policy's express and unambiguous terms.  As numerous courts have found, a government agency's issuance of compulsory process to an Insured pursuant to a formal order investigating the Insured's potential violations of law is a Claim because it is a written demand, or an administrative/regulatory proceeding commenced by a formal order of investigation, for non-monetary or injunctive relief.  In addition, the FTC's demand for a Hold Separate Agreement to maintain the status quo between ProMedica and St. Luke's was a written demand for non-monetary or injunctive relief and was also a Claim.

Deconstructing the Policy's terms well beyond their obvious intent, ProMedica principally contends that the FTC's full investigation and demand for a Hold Separate Agreement were not a Claim "*for a Wrongful Act*" because the FTC, at the time, did not definitively state that the merger with St. Luke's  (the "Acquisition") violated antitrust laws, but rather, stated only that it was investigating "whether" the Acquisition was unlawful.  Courts have readily dismissed such arguments when, as here, the policy plainly expresses an intent to cover formal investigations seeking to determine whether an Insured committed a Wrongful Act.  Such an investigation, by its very nature, examines whether there is merit to allegations of wrongdoing.  A contrary conclusion would effectively read out of the Policy coverage for investigations against Insureds that otherwise is intended by its plain terms.  Accordingly, the FTC's full investigation and its demand for a Hold Separate Agreement in August 2010 were a Claim under the 09/10 Policy and there is no coverage for the FTC investigation or the resulting litigation under either of the Policies.

Ignoring the parties' stipulation as to what is appropriate for pre-discovery summary adjudication in this case, ProMedica attempts to raise other issues associated with its application

for the 10/11 Policy and OneBeacon's causes of action based upon estoppel and known loss. As was discussed during the parties' Rule 16 Conference and seemingly accepted by ProMedica at that time, those causes of action require discovery into ProMedica's and OneBeacon's subjective knowledge at the time of the application for the 10/11 Policy and cannot be resolved without discovery.[3] The parties, however, did agree that the issue of when a Claim was first made by the FTC against ProMedica is an issue of law that can and should be decided by the Court prior to discovery, and a ruling on that issue in OneBeacon's favor will be dispositive of the entire case.[4]

**ARGUMENT**

I. **IN AUGUST 2010, THE FTC MADE WRITTEN DEMANDS FOR NON-MONETARY OR INJUNCTIVE RELIEF AND COMMENCED AN ADMINISTRATIVE OR REGULATORY PROCEEDING FOR SUCH RELIEF THROUGH A FORMAL INVESTIGATIVE ORDER OR SIMILAR DOCUMENT**

The Policies define a Claim, in pertinent part, to include either a "written demand for . . . non-monetary or injunctive relief," or "a[n] administrative [or] regulatory . . . proceeding for . . . [such] relief commenced by . . . the filing of a . . . formal investigative order or similar document." (Ex. 1, 09/10 Policy, § II - Definitions, (B) (STIP 34); Ex. 2, 10/11 Policy, § II - Definitions, (B) (STIP 106)). A demand for non-monetary or injunctive relief expressly includes, by way of example, "any request to toll or waive any statute of limitations." (*Id*.). The FTC's full investigation in August 2010, along with the FTC's contemporaneous demand for a Hold Separate Agreement, clearly satisfy the Policies' definition of a Claim. Seeking to avoid that inevitable conclusion, ProMedica employs misdirection by artificially parsing the FTC's

---

[3] Neither during the parties' July 1, 2011 Rule 16 conference nor at the July 11, 2011 scheduling conference with the Court did ProMedica ever recommend pre-discovery summary adjudication of the estoppel or known loss causes of action. For its part, OneBeacon certainly never agreed that those causes of action should be decided as a matter of law prior to discovery.

[4] OneBeacon seeks a declaratory judgment that there is no coverage for the FTC investigation and the resulting litigation. If the Court rules that the investigation was a Claim, the Court need not reach OneBeacon's alternative coverage defenses based on ProMedica's knowledge at the time of the application for the 10/11 Policy.

activities in August 2010 and contending that certain activities, such as the FTC's formal order authorizing use of compulsory process, did not specifically seek non-monetary or injunctive relief, while others, such as the subpoenas and CIDs, did not specifically reference a Wrongful Act.  However, even the most passing scrutiny shows that the FTC's activities in August 2010 included written demands, and/or an administrative or regulatory proceedings commenced by a formal investigative order or similar document, for non-monetary or injunctive relief for a Wrongful Act.

### A.    The FTC's Full Investigation Was A Claim

It is undisputed that, in August 2010, the FTC issued the Resolution directing a full investigation of the Acquisition through the use of compulsory process.  Specifically, the Resolution states:

> To determine whether the proposed [Acquisition] violates Section 5 of the [FTC] Act . . . ; to determine whether the [Acquisition], if consummated, would be in violation of Section 7 of the Clayton Act, . . . or Section 5 of the [FTC] Act. . . ; and to determine whether the requirements of Section 7A of the Clayton Act . . . have been or will be fulfilled with respect to said [Acquisition].

> The [FTC] hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

(Ex. 7 (STIP 150)).  Pursuant to the Resolution, the FTC issued subpoenas and CIDs to ProMedica demanding the production of documents and testimony under oath at investigational hearings.

The subpoenas and the CIDs indicate that they were issued in connection with the FTC's investigation of the Acquisition and each reference the FTC Resolution which was attached to the subpoenas and CIDs.  (*See, e.g.*, Ex. 9, Subpoena *Duces Tecum* to ProMedica at 1, 17 (STIP 153, 169);  Ex. 12, CID to ProMedica at 1, 20 (STIP 200, 219)).  Furthermore, the statutory authority pursuant to which the FTC served its CIDs specifically requires that the FTC "state the

nature of the conduct constituting *the alleged violation* which is under investigation and the provision of law applicable to such violation."  *See* 15 U.S.C. § 57b-1(c)(2) (emphasis added). To satisfy that requirement, the FTC's CIDs state:  "This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action [identified as the subject of the investigation]" which is, the "Proposed acquisition by [ProMedica] of [St. Luke's]."  (*See, e.g.*, Ex. 12, CID to ProMedica at 1 (STIP 200)).[5]

Thus, the FTC's full investigation was commenced by a formal "investigative order or similar document" and was an administrative or regulatory proceeding that included written demands for non-monetary relief in the form of compulsory demands for documents and testimony to address allegations of possible antitrust violations.  Accordingly, the FTC's full investigation was a Claim for a Wrongful Act.  That conclusion is fully supported by the relevant case law.

### 1.      The Relevant Case Law Supports OneBeacon's Position

When claims-made insurance policies became popular in the 1980s and 1990s, the term "Claim" typically was not specifically defined in the policies.  Courts applying those policies held that government investigations of potential wrongdoing by an insured through compulsory subpoenas for documents and testimony were Claims for Wrongful Acts.

---

[5]The subpoenas served by the FTC similarly identify the Acquisition as the subject of its investigation and incorporate the Resolution by reference.  (*See, e.g.*, Ex. 9, Subpoena *Duces Tecum* to ProMedica at 1 (STIP 153)). As discussed above, the Resolution specifically alleges that the Acquisition may violate federal antitrust laws. Therefore, like the CIDs, the FTC subpoenas also allege a Wrongful Act by ProMedica.

For example, in *Polychron v. Crum & Forster Insurance Cos.*, 916 F.2d 461 (8th Cir. 1990), a grand jury issued a subpoena for records from an insured bank and an Assistant United States Attorney interviewed the former bank president, who was also an insured.  *Id*. at 462.  The policy afforded coverage for "claims made against the Insureds . . . for a Wrongful Act."  *Id*.  Applying the ordinary meaning of the word "claim," the court found that a "claim" included a "demand" to do something – in that instance, "to produce certain documents."  *Id*. at 463 ("the documents demanded (not merely requested, as defendants would have it) related to plaintiff's conduct as a bank official").  The court further found that "the grand jury's investigation and the questioning by the Assistant United States Attorney amounted, as a practical matter, to an allegation of wrongdoing against [the former bank president]."  *Id*.

Likewise, in *Richardson Electronics, Ltd. v. Federal Insurance Co.*, 120 F. Supp. 2d 698 (N.D. Ill. 2000), the policy covered claims for a wrongful act.  *Id*. at 699 n.3.  Applying the commonly understood meaning of a "claim" as derived from dictionary definitions, the *Richardson Electronics* court held that the term included "a demand for *something* due," and rejected the contention that the demand had to be for money.  *Id*. at 701 (emphasis in original). The court ruled that an antitrust investigation, which included the issuance of subpoenas and CIDs for documents and testimony from the insured firm, was a claim for a wrongful act.  *Id*.

Following the trend of the last ten years or so, the Policies in this case, issued in 2009 and 2010, provide an express definition of a "Claim."  Rather than limiting the definition so as to preclude coverage for government investigations or demands for non-monetary relief (such as compulsory subpoenas), the Policies here expressly include within the definition of a Claim demands for non-monetary relief and for government proceedings commenced by formal

investigative orders – indicating an obvious intent to afford coverage, in a manner consistent with *Polychron* and *Richardson Electronics*, for government investigations of potential wrongdoing by an Insured.  Not surprisingly, courts have found that the definition of a Claim utilized in the Policies extends to the circumstances presented here.

In *Minuteman International, Inc. v. Great American Insurance Co*., No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004), the court applied a definition of "Claim" that included "a written demand for monetary or nonmonetary relief."  *Id*. at *3.  Notably, unlike the Policies in this case, the definition of a Claim did not include a proceeding commenced by a formal investigative order.  *Id*.  Rather, the definition only referenced proceedings commenced by a "complaint or similar pleading, the return of an indictment, or the receipt or filing of a notice of charges or similar document."  *Id*.  Nevertheless, after reviewing the policy language and the relevant case law, the court held that an investigation into the insureds' potential violation of securities laws by the Securities and Exchange Commission (the "SEC"), which included subpoenas for documents and testimony, was a Claim.  *Id*. at *4-7 (holding that "the relief sought by the subpoena itself is the production of documents or testimony").[6]

Applying a somewhat different definition of a Claim, the court in *National Stock Exchange v. Federal Insurance Co.*, No. 06 C 1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007), reached the same conclusion.  There, the policy afforded coverage for Loss resulting from a Claim for a Wrongful Act.  *Id*. at *1.  The policy defined a Claim, in part, as "a formal administrative or regulatory proceeding commenced by the filing of a . . . formal

---

[6]ProMedica's reliance on *Minuteman International* as evidence of the reasonableness of its construction of the term "relief" in the context of the 09/10 Policy is unavailing.  (Dkt. No. 30-1, ProMedica Br. at 14).  In *Minuteman International*, the court did not find the policy terms to be ambiguous.  Rather, the court merely held that where no case had ever construed the policy language at issue in the context of an SEC investigation, the insurer's denial of coverage was not unreasonable or vexatious so as to expose the insurer to additional liability under the unfair claims practices statutes.  2004 WL 603482, at *9.

investigative order or similar document."  *Id.*  Unlike the Policies here, however, the definition of a Claim did not include a written demand for non-monetary relief, but instead referenced only a "written demand for monetary damages."  *Id.*  Nevertheless, the court held, as a matter of law, that the policy's definition of a Claim "clear[ly]" and "unambiguous[ly]" included a formal investigation, such as that conducted by the SEC in that case.  *Id.* at *3-4.  Taking on ProMedica's challenge here, the *National Stock Exchange* court had no problem finding that the SEC investigation was a Claim "against an Insured Person for a Wrongful Act."  *Id.* at *4.  The court observed that the SEC's order of investigation stated that the purpose of the investigation was to "determine whether CSE, NSX, 'or any other persons' have engaged in the alleged securities violations."  *Id.*; *see also Ace Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 798 (D. Md. 2008) (holding that CIDs and subpoenas issued as part of investigation of insured's potential violation of consumer protection laws was a "Claim for Wrongful Acts").

The sound reasoning employed in *Minuteman International* and *National Stock Exchange* applies with even greater force in this case.  Here, the Policies' definition of a Claim is even broader than the definition in *Minuteman International*, and specifically includes proceedings commenced by a "formal investigative order."  The Policies' definition of a Claim is also broader than the definition analyzed in *National Stock Exchange* because the Policies' definition expressly includes demands and proceedings for "non-monetary relief."  Moreover, the Policies' inclusion of formal investigations in the definition of a Claim also evidences a clear contractual intent that a formal investigation of allegations of wrongdoing by an Insured should be considered a Claim for a Wrongful Act.[7]

---

[7] In light of the relevant case law, if ProMedica's position were accepted, it would leave insurers like OneBeacon in the no-win situation of being obligated to afford coverage for certain government investigations if the insured requests such coverage, without being afforded the protections of their claims-made policy language if the insured elects not to seek coverage for the investigations.

### 2. The Cases Cited by ProMedica Either Support OneBeacon's Position or Are Inapposite

ProMedica essentially cites four cases in regard to whether the FTC's full investigation was a Claim.  Each of the cases either actually supports OneBeacon's position or is readily distinguishable.  An excellent example of the former is *MBIA Inc. v. Federal Insurance Co.*, __ F.3d __, 2011 WL 2583080 (2d Cir. July 1, 2011).

There, the court, applying a definition of a Claim materially similar to that in the Policies, held that a formal investigation by the SEC was a Claim, even though the SEC relied upon oral requests for information rather than subpoenas.  *Id.* at *6-7.  ProMedica argues that the *MBIA* investigation was an investigation for a Wrongful Act because the SEC order of investigation stated that the insured "may" have violated securities laws, while the FTC Resolution in this case stated that the investigation was to determine "whether" ProMedica's Acquisition of St. Luke's violated antitrust laws.  (ProMedica Br. at 11-12).

The distinction between "may" or "whether" is undoubtedly one without a difference.  In both *MBIA* and this case, the government agencies conducted an investigation to determine "whether" there had or "may" have been a violation of applicable laws.  Indeed, in *MBIA*, the Second Circuit specifically referred to the "text of the SEC's formal order [as] stat[ing] that the SEC was empowered to investigate *whether* AIG and other insurance companies, including MBIA, engaged in securities fraud."  *MBIA Inc.*, 2011 WL 2583080, at *6 (emphasis added).  Apparently, the Second Circuit did not grasp the supposed difference between "whether" and "may" that ProMedica now seizes upon.  Rather, consistent with *MBIA*, the FTC's full investigation to determine "whether" the Acquisition "may" violate antitrust laws was a

- 9 -

proceeding to investigate a Wrongful Act.[8]  *See Nat'l Stock Exch.*, 2007 WL 1030293, at *5. (holding that where a policy defined "Wrongful Act" to  include acts "allegedly committed or attempted" by an insured, it included wrongful acts that "*may have been* committed" by the insured) (emphasis in original); *Ace Am. Ins.*, 570 F. Supp. 2d at 797 (holding that subpoena and investigative demand alleged a Wrongful Act because their purpose "is to investigate potential violations of [state law]").[9]

An example of a readily distinguished case is *Center for Blood Research, Inc. v. Coregis Insurance Co.*, 305 F.3d 38 (1st Cir. 2002) ("*Coregis*").  Indeed, the courts in *Minuteman International* and *Ace American* readily distinguished *Coregis* from those cases and, by extension, from this case.  *See Minuteman Int'l*, 2004 WL 603482, at *6; *Ace Am. Ins.*, 570 F. Supp. 2d at 796.  As highlighted in both of those cases, the finding in *Coregis* that an investigative subpoena did not constitute a Claim turned on a specific policy requirement for a Claim – not present here – that the judicial or administrative proceeding must subject the insured "to a *binding adjudication of liability* for damages or other relief."  *Coregis*, 305 F.3d at 43 (emphasis added).  Further, as recognized in *Coregis*, *Minuteman International*, and *Ace American*, the insured in *Coregis* "was not a target of the investigation."  *Minuteman Int'l*, 2004 WL 603482, at *6; *see also Coregis*, 305 F.3d at 42; *Ace Am.*, 570 F. Supp. 2d at 796.  Indeed, as noted in *Ace American*, "there was no suggestion [in *Coregis*] that the government was seeking

---

[8]ProMedica's efforts to bootstrap the disclaimer language in the FTC's notice to ProMedica of its initial investigation into the Acquisition similarly fail.  The FTC's notice of its initial investigation did include a statement that "[n]either this letter nor the existence of this non-public investigation should be construed as indicating that a violation has occurred or is occurring."  (Ex. 4, FTC Voluntary Access Letter at 1 (STIP 138)).  However, neither the FTC's later letter informing ProMedica of its full investigation nor the Resolution included any similar disclaimer language.  (*See* Ex. 6, J. Liu Ltr. of Aug. 6, 2010 (STIP 149); Ex. 7, Resolution (STIP 150)).  Indeed, contrary to ProMedica's assertion, the absence of such disclaimer language in the FTC's notice of full investigation and Resolution indicates that transition from an initial investigation to a full investigation should be viewed as strongly suggesting a violation of antitrust laws.

[9]It is also worth noting that the FTC's CIDs, in describing ProMedica's alleged antitrust violations, use the word "may."  (*See, e.g.* Ex. 12, CID to ProMedica at 1 (STIP 200)).

anything other than information from the Center."  *Ace Am.*, 570 F. Supp. 2d at 796.  Thus, *Coregis* serves only as a perfect example of how subpoenas may not constitute a claim when they are served for informational purposes only without the existence of an investigation directed at potential wrongdoing by the insured.[10]

Similar to *Coregis*, *Federal Insurance Co. v. Illinois Funeral Director's Association*, No. 09 C 1634, 2010 WL 5099979 (N.D. Ill. Dec. 8, 2010), is yet another example of an insured served with a subpoena for information that was not tied to a specific investigation of allegations of wrongdoing by an insured.  *Id.* at *4.  Accordingly, the subpoena was not considered to be a demand for non-monetary relief for a Wrongful Act.  *Id.*

Finally, ProMedica points to the definition of a Claim in *Office Depot, Inc. v. National Union Fire Insurance Co.*, 734 F. Supp. 2d 1304 (S.D. Fla. 2010) and argues that, if OneBeacon wanted subpoenas to be a Claim, it should have written the Policies' definition of a Claim to be like the definition in *Office Depot*.  There, the directors and officers liability policy's definition of a Claim included:

> (3) a . . . regulatory investigation of an Insured Person;
>
> (i) once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or
>
> (ii) in the case of an investigation by the SEC or similar state or foreign government authority, after service of a subpoena on such Insured Person.

*Id.* at 1310 (emphasis omitted).  The definition of Claim at issue in *Office Depot* relies upon an entirely different construct than the definition in the Policies as it limits coverage to proceedings

---

[10]As ProMedica recognizes, the FTC's allegations of potential violations of antitrust laws are included in the CIDs that were served upon St. Luke's and Paramount Healthcare and they necessarily only allege wrongful conduct by ProMedica as the acquiring entity.  (ProMedica Br. at 15-16).  It is precisely for that reason that the subpoenas and CIDs do not constitute a Claim against St Luke's or Paramount Healthcare, but *do* constitute a Claim against ProMedica.  This is also in line with the distinction recognized between a subpoena to the target of an investigation, which is a Claim, and a mere custodian of records subpoena, which is not a Claim. *See, e.g.*, *Ace Am. Ins. Co.*, 570 F. Supp. 2d at 797 (holding that a subpoena and CID were "claims" and not mere requests for information because they "indicate[d] that [the insured] is a target of the investigation, not simply a source of information").

*against Insured Persons*, requiring that the Insured Person be identified in writing as a target of the proceedings or, alternatively, the Insured Person must receive a subpoena from the SEC or a similar state or foreign government authority.  As the language of the Policies demonstrate, there is simply no intent by the parties here to so limit coverage either to Claims against Insured Persons or subpoenas from the SEC or similar state or foreign authorities.

### B.  The FTC's Demand For A Hold Separate Agreement Is A Claim

The kicker here is that, in addition to the formal investigation, subpoenas, and CIDs, which were determined to be a Claim in *Polychron*, *MBIA*, *et al.*, the FTC also made a written demand on ProMedica for injunctive relief, which the Policies specifically include in the definition of a Claim.  In August 2010, and in conjunction with its full investigation, the FTC demanded a Hold Separate Agreement from ProMedica and, if ProMedica did not execute the Agreement, the FTC indicated it would file an action for injunctive relief then and there.  (*See* Ex. 18, District Court Action Compl. ¶ 2 (STIP 294) ("In order to avoid potential legal action by the [FTC] at that time, [ProMedica] agreed with [FTC] staff to a limited 'hold-separate agreement' . . . .")).

Contrary to ProMedica's assertion, the FTC's demand for a Hold Separate Agreement is a Claim because it does seek specific relief from ProMedica to redress an alleged Wrongful Act. It is only by removing the Hold Separate Agreement document from the context in which it arose that ProMedica can assert that the FTC did not allege a Wrongful Act.  The prior communications between the FTC and ProMedica and the language of the Hold Separate Agreement make clear that the FTC had alleged that the Acquisition may violate the antitrust laws administered by the FTC.  Thus, the Hold Separate Agreement is a Claim for a Wrongful Act.

In addition, the Hold Separate Agreement undeniably seeks various forms of relief from ProMedica – even under ProMedica's proffered definition of the term "relief."[11]  ProMedica suggests that the ordinary definition of the term "relief" is "legal redress or remedy" or "deliverance from hardship, burden or grievance."  (ProMedica Br. at 12-13).  By way of the Hold Separate Agreement, the FTC demanded that ProMedica refrain from consolidating its operations with those of St. Luke's in order to maintain the viability of St. Luke's as an independent competitor in the event that the Acquisition was determined to be in violation of antitrust laws.  The FTC's request to maintain the status quo in order to avoid what the FTC alleged to be potentially irreparable harm if the Acquisition were fully consummated and later determined to be anticompetitive[12] is plainly legal redress or remedy and/or deliverance from hardship, burden or grievance.

Moreover, ProMedica's characterization of the FTC's reservation of rights in the Hold Separate Agreement to seek additional relief in the future as some type of "expression" by the FTC of its supposed view that it did not seek any form of relief by way of the Hold Separate Agreement is completely nonsensical.  (*See* ProMedica Br. at 13).  Indeed, unless the Hold Separate Agreement could be construed as providing the FTC with some form of relief at the time of its execution, there would be no need for the FTC to reserve its right to seek other forms of relief *in the future*.  Further, quite to the contrary of ProMedica's suggestion, the FTC demonstrably viewed the Hold Separate Agreement as affording it certain relief because, when that agreement was set to expire, the FTC commenced an action in this Court seeking a temporary restraining order and a preliminary injunction that would afford the FTC similar relief

---

[11]This is particularly evident when the Policies state, by way of example, that "any request to toll or waive any statute of limitations" would be a Claim in the form of a demand for non-monetary or injunctive relief.

[12](*See* Ex. 15, FTC Emergency Petition to Enforce Subpoenas and CIDs at 1-2 (STIP 254-55) (arguing that "once the hold-separate agreement expires, . . .  the [FTC's] ability to obtain effective relief, if the transaction is later held unlawful, will be greatly diminished")).

pending the outcome of its administrative proceeding.  (*See* Ex. 18, FTC's District Court Action Compl., Introduction and ¶ 1 (alleging that the FTC "requires the aid of this Court to maintain the *status quo* during the administrative proceeding" and that "[w]ithout temporary and preliminary injunctive relief, . . . ProMedica may fully integrate its operations with those of St. Luke's . . . and irreversibly undermine the [FTC's] ability to order effective relief if the transaction is deemed  unlawful . . .")).

Thus, the Hold Separate Agreement was a written demand for relief from ProMedica to remedy the potential anticompetitive harm that might arise from the Acquisition's alleged violation of federal antitrust laws, and therefore is a Claim as that term is defined by the Policies.

## II.  THE KNOWN LOSS DOCTRINE OR EQUITABLE ESTOPPEL PRECLUDES COVERAGE FOR THE FTC CLAIM

### A.  ProMedica's Alleged Disclosure Of The Acquisition Does Not Preclude Application Of The Known Loss Doctrine To The FTC Claim

ProMedica's disclosure of the Acquisition in a later application for a different type of coverage from OneBeacon cannot defeat OneBeacon's known loss claim.  First, ProMedica does not deny that it failed to disclose the fact of the Acquisition in its application for the 10/11 Policy, which was signed by its Chief Financial Officer Kathleen S. Hanley on August 17, 2010.  (*See* Ex. 23, Renewal Application at 6 (STIP 601)).  Question 4 of the Renewal Application inquired as follows:

> Has Applicant in the past eighteen (18) months completed or agreed to, or does it contemplate during the next twelve (12) months, any of the following, whether or not such transactions were or will be completed:
>
> *              *              *
>
> (c)      Mergers, acquisitions or divestitures?              ☐ Yes    ☐ No
>
> *              *              *

> If "Yes" to any part of Question 4, please describe the essential terms of
> each such transaction as an attachment.

(Ex. 23, Renewal Application, at 2 (STIP 597)).  ProMedica responded "Yes" and provided the

following further explanation, "Yes, we are always contemplating new."  (*See id.* at 2 (STIP

596); *id.* at Supplemental Responses (STIP 602)).  While ProMedica's response might

technically be truthful, its failure to disclose the Acquisition, which was about to be

consummated and was already under federal investigation, was a glaring omission.  Moreover,

the Renewal Application was an ideal mechanism by which ProMedica could and should have

disclosed the Acquisition and the ongoing FTC investigation.  Finally, regardless of what

ProMedica's reasons for failing to disclose the Acquisition in its Renewal Application might

have been, there can be no doubt that ProMedica's Chief Financial Officer, who signed the

Renewal Application, was aware of both the Acquisition and FTC investigation.

As explained in the attached Declaration of Jake Clinton, OneBeacon's underwriter for

the Policies, while he understood that ProMedica was "always contemplating" mergers, he

nevertheless expected that ProMedica would disclose any transaction of this magnitude in its

Renewal Application, whether the transaction was pending or actually completed.  (*See* Decl. of

Jake Clinton ("Clinton Decl."), attached hereto as Exhibit A, ¶ 5).  Mr. Clinton would have

expected disclosure of the Acquisition in the Renewal Application because it was material to the

risk being assumed by OneBeacon under the 10/11 Policy as it would potentially impact several

factors considered in the underwriting process, including but not limited to:  (1) significant

merger and acquisition activity and the potential for future claims arising therefrom; (2) the

overall financial condition of the company; (3) the number of beds made available to the public;

(4) the percentage of revenue received from Medicaid and Medicare; and (5) the number of

employees on staff.  (*See id.*, ¶¶ 5-6).  However, OneBeacon was not able to accurately assess

these factors in its underwriting of the 10/11 Policy because ProMedica failed to disclose the Acquisition in its Renewal Application.  (*See id.*, ¶ 7).  ProMedica's failure to disclose the FTC's investigation of the Acquisition only served to exacerbate the harm suffered by OneBeacon in its underwriting of the 10/11 Policy based upon the incomplete and/or inaccurate information supplied by ProMedica.  Indeed, had OneBeacon been aware of the Acquisition and the FTC's investigation thereof, the terms and conditions of the 10/11 Policy and/or the premium for which OneBeacon offered such coverage would have been materially different.  (*See id.*, ¶ 8).

Notwithstanding ProMedica's assertion that the Acquisition was disclosed to OneBeacon prior to the inception of the 10/11 Policy, the fact of the matter is that OneBeacon had already completed its underwriting, such as it was, for the 10/11 Policy and had issued a quote to ProMedica's broker on August 31, 2010 – weeks before OneBeacon ever received ProMedica's supposed disclosure of the Acquisition in an application for an entirely different type of policy.  More specifically, OneBeacon received ProMedica's excess fiduciary liability application on September 17, 2010, signed by its Corporate Director for Corporate Risk & Insurance Management.  (*See* Ex. 25, M. Laine E-mail of Sept. 17, 2010 (and attachments thereto) (STIP 625)).  At that time, ProMedica's broker requested a quote on an expedited basis so as to avoid any potential lapse in ProMedica's coverage if the excess policy were not bound before ProMedica's existing excess coverage expired on September 29, 2010.  (*See* Clinton Decl. ¶ 12).  As explained in the Declaration of Jake Clinton, the factors involved in underwriting a fiduciary liability policy are much different than those considered in underwriting the 10/11 Policy, in part because the fiduciary liability policy does not afford coverage for Antitrust Violations.[13]  (*See*

---

[13]ProMedica does not offer any explanation as to why its Chief Financial Officer did not disclose the Acquisition in the 10/11 Policy's application when specifically asked for such information while, on the other hand, its Risk Manager *did* disclose the Acquisition in its application for fiduciary coverage, which was originally submitted to a different insurer.

- 16 -

*id.*, ¶ 13).  Further, there are significant differences between underwriting primary coverage and excess coverage.  (*See id.*, ¶ 14).  Thus, the issues upon which OneBeacon focused in order to underwrite and quote the requested excess fiduciary liability coverage on an expedited basis did not implicate the same factors or issues OneBeacon considered in underwriting the 10/11 Policy. Thus, consideration of the Acquisition in connection with underwriting the excess fiduciary liability policy simply did not trigger any red flags suggesting that OneBeacon should revisit its already completed underwriting of the 10/11 Policy.  (*See id.*, ¶¶ 15-16).

Finally, ProMedica's purported disclosure of the Acquisition alone is hardly equivalent to disclosure of the FTC's full investigation of the Acquisition or its demand for a Hold Separate Agreement.  Had ProMedica provided OneBeacon with notice of the FTC investigation, it assuredly would have caused OneBeacon to revisit its underwriting for the 10/11 Policy.  (*See id.*, ¶¶ 6, 8).  However, only ProMedica knew that it was already suffering a loss by virtue of the FTC investigation into the Acquisition, which was a Claim under the 09/10 Policy, and ProMedica failed to inform OneBeacon of this fact in its Renewal Application.  Because ProMedica had knowledge of the FTC Claim prior to the inception of the 10/11 Policy and failed to disclose it to OneBeacon, the known loss doctrine bars coverage for the FTC Claim under the 10/11 Policy.

### B.  Application Of Equitable Estoppel To Preclude Coverage For The FTC Claim Is Not Tantamount To Rescission Of The 10/11 Policy

Contrary to ProMedica's assertion, OneBeacon does not seek to rescind the 10/11 Policy by application of equitable estoppel.  A rescission of the Policy would extinguish the Policy from the time of its inception and eliminate coverage for any and all Claims under the Policy.  Here, OneBeacon contends only that there should be no coverage under the 10/11 Policy for any Claims arising out of the FTC's challenge to the Acquisition because of ProMedica's failure to

disclose the Acquisition and the FTC's investigation thereof in conjunction with its application for the 10/11 Policy.  This would not preclude coverage under the 10/11 Policy for any Claims that are not Related Claims with the FTC Claim that might be made against ProMedica during the Policy Period of the 10/11 Policy.  Moreover, the language of the non-rescindable endorsement expressly reserves to OneBeacon any other rights or remedies that might be available to it.  Thus, equitably estopping ProMedica from seeking coverage under the 10/11 Policy for the FTC Claim or any Related Claims is not tantamount to rescission of the Policy in violation of the endorsement.

### C.  Pursuant To Rule 56(d), OneBeacon Requires Discovery In Order To Fully Respond To ProMedica's Challenge To The Known Loss and Estoppel Claims

At the July 11, 2011 case management conference, the parties agreed that the question of when a Claim was first made by the FTC against ProMedica was an issue of contract construction that the Court can and should resolve as a matter of law without discovery. However, ProMedica's motion for summary judgment exceeds the scope of the parties' agreement regarding issues that can be resolved without discovery and seeks a judgment in its favor on OneBeacon's known loss and equitable estoppel claims.  More specifically, ProMedica asserts that it had no knowledge of a loss in connection with the FTC investigation and argues that knowledge of a "risk of loss" is not the same as a "known loss."  ProMedica also asserts that it cannot be equitably estopped from seeking coverage for the FTC Claim under the 10/11 Policy because ProMedica disclosed the fact of the Acquisition to OneBeacon in connection with an application for a different insurance policy and because OneBeacon issued an endorsement to the 10/11 Policy rendering its D&O Coverage non-rescindable.

As set forth in greater detail in the Declaration of April H. Gassler, attached hereto as Exhibit B, OneBeacon cannot adequately respond to ProMedica's motion for summary judgment

on these claims without discovery from ProMedica and/or third parties on several issues, including but not limited to:

- Internal communications within ProMedica and communications between ProMedica and its insurance broker regarding whether the FTC investigation was a "Claim" or "known loss" prior to the expiration of the 09/10 Policy;

- Internal communications within ProMedica and communications between ProMedica and its insurance broker regarding disclosure of the Acquisition and/or the FTC's investigation thereof to OneBeacon in the Renewal Application;

- Internal communications within ProMedica and communications between ProMedica and its insurance broker regarding whether to provide OneBeacon with notice of the FTC's investigation of the Acquisition as a Claim or potential Claim pursuant to the terms of the 09/10 Policy; and

- Internal communications within ProMedica and communications between ProMedica and its insurance broker regarding the request for and negotiation of the non-rescindable endorsement to the 10/11 Policy.

(*See* Ex. B, Gassler Decl. ¶¶ 5-8).

Without this discovery, OneBeacon simply cannot refute ProMedica's assertion that it did not perceive the FTC investigation to be a Claim and it therefore constituted a mere "risk of loss" to which the known loss doctrine does not apply.  Similarly, without discovery of the facts surrounding ProMedica's decision not to provide OneBeacon with notice of the FTC investigation, whether as a Claim or a potential Claim under the 09/10 Policy, OneBeacon cannot demonstrate that principles of equity and good conscience should preclude coverage for the FTC Claim under the 10/11 Policy.  Therefore, OneBeacon respectfully requests that the Court deny

that portion of ProMedica's motion for summary judgment directed at OneBeacon's known loss and equitable estoppel claims and afford OneBeacon with an opportunity to take discovery prior to adjudicating those claims.  *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" defer considering the motion, deny it, or allow time to obtain discovery); *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1195 (6th Cir. 1995) ("Before ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case.").

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Defendant/Counter-Plaintiff ProMedica Health System, Inc.'s motion for summary judgment should be denied.

Dated:  September 2, 2011                                      Respectfully submitted,


/s/ Julie L. Juergens
Julie L. Juergens (0066873)
GALLAGHER SHARP
1501 Euclid Avenue
6th Floor
Cleveland, OH  44115
Tel:  (216) 522-1372
Fax: (216) 241-1608
jjuergens@gallaghersharp.com

- and -

Thomas J. Judge (*pro hac vice*)
April H. Gassler (*pro hac vice*)
THOMPSON, LOSS & JUDGE, LLP
1133 21st Street, NW
Suite 450
Washington, DC 20036
Tel:  (202) 778-4060
Fax: (202) 778-4099
tjudge@tljlaw.com
agassler@tljlaw.com

*Attorneys for Plaintiff/Counter-*
*Defendant Employers' Fire*
*Insurance Co.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1(f), the undersigned hereby certifies that this case has been assigned a standard track and complies with the twenty (20) page limitation applicable to memoranda relating to dispositive motions in standard track cases.

/s/ Julie L. Juergens
Julie L. Juergens (0066873)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiff/Counter-Defendant Employers' Fire Insurance Company's Memorandum of Law in Opposition to Defendant/Counter-Plaintiff ProMedica Health System, Inc.'s Motion for Summary Judgment was served upon all counsel of record via the Court's CM/ECF system on this 2nd day of September, 2011.

/s/ Julie L. Juergens
Julie L. Juergens (0066873)