IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Employers' Fire Insurance Co., | Case No. 3:11 CV 923 |
| Plaintiff/Counter-Defendant, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| ProMedica Health System, Inc., | |
| Defendant/Counter-Plaintiff. | |

### INTRODUCTION

The question before this Court is whether an insurer must pay an insured's costs of defending a civil action by the Federal Trade Commission ("FTC") to enjoin a merger. Resolution of this question turns on whether the insured was required to give notice to the insurer once the FTC began a formal investigation.

The matter is before this Court on cross-motions for summary judgment (Doc. Nos. 29–30 and 40–43). This Court held a record hearing on December 20, 2011 (Doc. No. 46). Plaintiff/Counter-Defendant Employers' Fire Insurance Co. ("OneBeacon") is the insurance provider and Defendant/Counter-Plaintiff ProMedica Health System, Inc. ("ProMedica") is the policyholder operating a not-for-profit healthcare system in northwest Ohio and southeastern Michigan (Doc. No. 27 at 1–2). OneBeacon seeks declaratory judgment denying ProMedica insurance coverage (Doc. No. 1 at 13). ProMedica seeks reimbursement of legal expenses (Doc. No. 19 at 16).

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. As a federal court sitting in diversity, this Court applies Ohio substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

### THE TERMS OF THE INSURANCE POLICIES

This case involves two essentially identical insurance policies OneBeacon provided to ProMedica (Doc. Nos. 27-1 and 27-2) (collectively the "Policies"). The first policy period (the "09/10 Policy") was from September 29, 2009 to September 29, 2010. The second policy period (the "10/11 Policy") was from September 29, 2010 to September 29, 2011 (Doc. No. 27 at 2).

The Policies provide ProMedica fifteen million dollars of Directors, Officers & Organization insurance ("D&O") (Doc. Nos. 27-1 at 2 and 27-2 at 2). Specifically, the D&O covers: "[A]ny **Claim** first made against [ProMedica] during the **Policy Period** or applicable Extended Reporting Period for a **Wrongful Act**; provided that such **Claim** is reported to [OneBeacon] in accordance with Section VIII . . . ." (Doc. Nos. 27-1 at 34 and 27-2 at 43) (emphasis throughout in originals).

Section VIII, OneBeacon's notice requirement, states (Doc. Nos. 27-1 at 48 and 27-2 at 57):

[ProMedica] must, as a condition precedent to any right to coverage . . . give the Underwriter written notice . . . as soon as practicable after [ProMedica] first becomes aware of such **Claim**, and in no event later than:

(1) with respect to any **Claim** first made during the **Policy Period**, ninety (90) days after the end of the **Policy Period**; or

(2) with respect to any **Claim** first made during any applicable Extended Reporting Period, ninety (90) days after the end of the Extended Reporting Period.

Even if a Claim does not arise during the Policy Period, ProMedica still must provide notice to OneBeacon if ProMedica became aware of an action which may lead to a Claim (Doc. Nos. 27-1 at 49 and 27-2 at 58):

> [If ProMedica] becomes aware of a specific **Wrongful Act** which may subsequently give rise to a **Claim** [ProMedica must give] notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the end of the **Policy Period**; and . . . request[] coverage . . . for any **Claim** subsequently arising from such **Wrongful Act**. . . . All **Related Claims**, whenever made, shall be deemed a single **Claim** made when the earliest of such **Related Claims** was first made.

> A "**Related Claim**" broadly includes (Doc. Nos. 27-1 at 25 and 27-2 at 34).

> [A]ll **Claims** for **Wrongful Acts** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way.

The Policies define "**Claim**" as (Doc. Nos. 27-1 at 35 and 27-2 at 44 ):

> (1)  a written demand for monetary, non-monetary or injunctive relief . . . ; or
> (2)  a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by:
>   (a)  the service of a complaint or similar pleading;
>   (b)  the return of an indictment, information or similar document . . . ; or
>   (c)  the filing of a notice of charges, formal investigative order or similar document,
>
> against an **Insured** for a **Wrongful Act** . . . .

The Policies define "**Wrongful Act**" as "any actual or alleged act, error, omission . . . or breach of duty by [ProMedica]," including any "**Antitrust Violation**." (Doc. Nos. 27-1 at 40 and 27-2 at 49).

An "**Antitrust Violation**" includes "any actual or alleged . . . violation of . . . the Clayton Act of 1914 . . . [or] the Federal Trade Commission Act of 1914 . . . ." (Doc. Nos. 27-1 at 35 and 27-2 at 44).

### THE ACQUISITION OF ST. LUKE'S AND THE FTC INVESTIGATION

In May 2010, ProMedica entered into an agreement with St. Luke's Hospital ("St. Luke's"), pursuant to which ProMedica would acquire St. Luke's ("the acquisition"). The acquisition was scheduled to close on July 30, 2010 (Doc. No. 27 at 2). Below is a time line of events forming the basis of this coverage dispute:

3

| | |
|---|---|
| July 15, 2010 | The FTC first enters the picture, sending a letter to ProMedica regarding the acquisition (Doc. No. 27-3). The letter advised the FTC would be "conducting a non-public preliminary investigation to determine whether the acquisition . . . may be anticompetitive and in violation of Section 7 of the Clayton Act . . . or Section 5 of the Federal Trade Commission Act . . . ." and warned that if it concluded the acquisition "would have anticompetitive effects" then a "a preliminary injunction blocking . . . that transaction" might be appropriate (Doc. No. 27-3 at 2). ProMedica was directed to "preserve . . . all documents and information relating to (a) ProMedica's proposed acquisition . . . (b) competition among hospitals . . . in [the region], (c) St. Luke's negotiating and contracting with health plans, and (d) litigation and settlement of litigation involving health care providers in [the region]." (Doc. No. 27-3 at 2). |
| July 16, 2010 | The FTC sent a second letter requesting "relevant information and documents" in ProMedica's control, noting "[n]either this letter nor the existence of this non-public investigation should be construed as indicating that a violation has occurred or is occurring." (Doc. No. 27-4 at 2). |
| August 5, 2010 | ProMedica supplied some of the information requested, along with a brief letter arguing the acquisition would not be anticompetitive (Doc. No. 28-1). |
| August 6, 2010 | The FTC's investigation transitioned to "full-phase" (Doc. No. 27-6 at 2) and the FTC requested ProMedica delay the acquisition until August 27, 2010, "to allow . . . additional time for the FTC's investigation." (Doc. No. 27-6 at 2). |
| August 9, 2010 | The FTC formally ordered documents to be turned over (Doc. No. 27-7). |
| August 10, 2010 | The FTC demanded a Hold Separate Agreement ("HSA") requiring ProMedica to maintain St. Luke's as an independent entity for a period of sixty days following the acquisition (Doc. No. 27-8). |
| August 18, 2010 | ProMedica agreed to the HSA (Doc. No. 27 at 3, ¶ 12) -- including "certain limited constraints" pending "any challenge to the Acquisition brought by the Commission" (Doc. No. 27-8 at 3). |

| | |
|---|---|
| August 25, 2010 | The FTC issued a Subpoena *Duces Tecum* (Doc. No. 27-9), and a Civil Investigative Demand ("CID") requiring even more disclosures regarding the acquisition. The CID stated (Doc. No. 27-12 at 1): |

> This demand is issued pursuant to Section 20 of the Federal Trade commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission . . . .

Both the subpoena and CID were accompanied by the August 9 formal order for documents (Doc. Nos. 27-9 at 18 and 27-12 at 20–21).

| | |
|---|---|
| August 31, 2010 | ProMedica completed the acquisition subject to the HSA (Doc. No. 27 at 4). |
| October 13, 2010 | The FTC filed a petition in federal court to compel production of documents covered by the subpoena and CID, alleging ProMedica had "produced only a small fraction of the documents and information requested by the subpoenas and CIDs . . . ." (Doc. No. 27-15 at 10–11). That matter was voluntarily dismissed on January 12, 2011. *Federal Trade Comm'n v. ProMedica Health Sys., et al.*, Case No. 3:10-cv-2340 (N.D. Ohio Oct. 13, 2010). |
| January 6, 2011 | The FTC filed an administrative action against ProMedica "having reason to believe that [the acquisition was] in violation of Section 7 of the Clayton Act . . . ." (Doc. No. 27-17 at 2). |
| January 7, 2011 | The FTC filed a federal lawsuit against ProMedica seeking an injunction to extend the HSA (Doc. No. 27-18). *Federal Trade Comm'n, et al. v. ProMedica Health Sys.,* Case No. 3:11-cv-47 (N.D. Ohio Jan. 7, 2011). |
| January 13, 2011 | ProMedica provided a First Notice of Loss to OneBeacon under its 10/11 Policy regarding the FTC's litigation to prevent the acquisition of St. Luke's (Doc. No. 27-19 at 2–3). |
| March 29, 2011 | The federal court granted the FTC's request for a preliminary injunction of the acquisition directing the parties to abide by the terms of the HSA until "the completion of all legal proceedings by the Commission challenging the Acquisition . . . ." *Federal Trade Comm'n, et al. v. ProMedica Health Sys., Inc.*, 2011 WL 1219281 at *61 (N.D. Ohio March 29, 2011). |
| May 10, 2011 | OneBeacon denied coverage to ProMedica for the FTC Claim (Doc. No. 27-21). |

5

None of the material facts are in dispute. The parties only dispute when ProMedica's duty arose to give notice to OneBeacon. OneBeacon argues the FTC investigation in August 2010 put ProMedica on notice of a Claim and triggered a duty to give notice; ProMedica says no duty arose until January 2011 when the FTC filed its Complaint in federal court.

### ONEBEACON'S DENIAL OF COVERAGE

OneBeacon's denial stated (Doc. 27-21 at 4):

> [The Claim] was first made on or around August 9, 2010, when the FTC issued a resolution authorizing the commencement of a formal investigation. Alternatively, the Claim was first made on or around August 18, 2010, when the Hold Separate Agreement was executed. The FTC Actions are a mere continuation of the FTC Investigation and/or the Hold Separate Agreement, and as such are part of the same Claim. Moreover, even if the FTC Actions are considered to be a separate Claim, which they are not, the FTC Actions would nonetheless be Related Claims to the FTC Investigation, and the Hold Separate Agreement. As such, the FTC Actions, the FTC Investigation, and the Hold Separate Agreement would be deemed to be a single Claim that was first made at the time the FTC Investigation Claim was made. Because the FTC Actions are not a Claim that was first made during the 2010 Policy Period, they are not covered under that Policy.

OneBeacon also denied coverage under the earlier 09/10 Policy "because it appear[ed] that the FTC Actions are part of a Claim that was first made during the 2009 Policy Period" and ProMedica had failed to comply with Section VIII, requiring notice by December 27, 2010 (Doc. No. 27-21 at 5).

Further, OneBeacon denied coverage under the 10/11 Policy because ProMedica "failed to disclose" the planned acquisition with St. Luke's during that Policy application process in the fall of 2010. According to OneBeacon, this precludes coverage under "a number of doctrines including, but not limited to equitable estoppel, known loss, and/or loss in progress" (Doc. No. 27-21 at 4). If this Court finds ProMedica's notice was untimely, it need not reach these remaining issues (Doc. No. 46 at 44).

6

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Further, the interpretation of an insurance contract is a question of law for the courts. *United Nat. Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450 (6th Cir. 1999). In Ohio, insurance contracts are "construed . . . with the same rules as other written contracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St. 3d 657, 665 (1992). "Courts are required to interpret the contract in such a way as to give effect to the intention of the parties . . . ." *Watkins v. Brown*, 97 Ohio App. 3d 160, 163 (Ohio Ct. App. 1994). Thus, "if the language of the policy's provisions is clear and unambiguous, this court may not 'resort to construction of that language.'" *Hybud Equip.*, 64 Ohio St. 3d at 665 (quoting *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 167 (1984) "Contract terms are to be given their 'natural and usual' meaning if they are not defined in the policy . . . ." *Watkins v. Brown*, 97 Ohio App. 3d 160, 164 (Ohio Ct. App. 1994). However, "where policy language is ambiguous, that language is to be construed in the way that is most favorable to the insured." *Watkins*, 97 Ohio App. 3d at 164.

## CLAIMS-MADE POLICIES

This case involves two claims-made policies. In a claims-made policy, "[i]f the insured does not give notice within the contractually required time period . . . there is simply no coverage under the policy." *Mueller v. Taylor Rental Ctr.*, 106 Ohio App. 3d 806, 810 (Ohio Ct. App. 1995) (citing *City of Harrisburg v. Int'l. Surplus Lines Ins. Co.*, 596 F. Supp. 954, 961 (M.D. Pa. 1984)). Claims-made policies give the insurer "the ability to calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point . . . ." *Mueller*, 106 Ohio App. 3d at 811.

Under the OneBeacon claims-made policies, even though there was a seamless transition between them, ProMedica's ability to recover for Claims first made under the 09/10 Policy terminated on December 27, 2010, the end of the extended reporting period for that Policy (Doc. No. 27-1 at 48). If OneBeacon is correct, then the Claim first arose during the 09/10 Policy, and ProMedica's notice on January 13, 2011, was seventeen days late.

## WHAT IS A CLAIM UNDER THE POLICY

OneBeacon argues a Claim first arose during the flurry of activity by the FTC in August 2010, "separately or in combination:" (1) the formal investigation with discovery order; (2) the subpoenas and CIDs demanding testimony and document production; and (3) the HSA (Doc. No. 29-1 at 15).

A Claim, under the 09/10 Policy, has five requirements. It must be (Doc. No. 27-1 at 35):

1. an administrative or regulatory proceeding;
2. for monetary, non-monetary or injunctive relief commenced by;
3. either the service of a complaint, the filing of a formal investigative order, or a similar document;
4. against an Insured; and
5. for a Wrongful Act.

ProMedica argues the August actions by the FTC fail the second criteria (injunctive relief) and fifth criteria (Wrongful Act) (Doc. No. 30-1 at 7), and only the later January 2011 federal court filings satisfy all five requirements of a Claim under the Policy (Doc. No. 30-1 at 5).

8

**DID THE FTC SEEK INJUNCTIVE RELIEF**

Did the notices, subpoenas, and agreements between the FTC and ProMedica, all of which took place before the end of the 09/10 Policy, seek injunctive relief? OneBeacon argues: "[c]ourts analyzing policy terms comparable to those used in the Policies" have found a claim existed in similar circumstances (Doc. No. 29-1 at 17) In *National Stock Exchange v. Federal Ins. Co.*, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007), the Securities and Exchange Commission ("SEC") sent the policyholder an "Order Directing Private Investigation and Designating Officers to Take Testimony" and "Wells Notices." The district court found the order gave rise to a claim under the policy because it was a "*formal investigation order* . . . ." *Id.* at *3 (emphasis in original). Courts have also distinguished between subpoenas used for an investigation and subpoenas merely used to seek information. *Center for Blood Research, Inc. v. Coregis Ins. Co.*, 305 F.3d 38, 42 (1st Cir. 2002) (holding the former constitutes a claim while the latter does not).

By August 2010, the FTC investigation transitioned to "full-phase" and was accompanied by compulsory procedures (Doc. No. 27-6). The FTC uses full-phase investigations for three purposes: (1) administrative fact-finding, to determine whether injunctive relief is appropriate; (2) gathering criminal evidence; and (3) "obtain[ing] data about industry practices to support a recommendation for the proposal of a trade regulation rule . . . ." FTC Operating Manual §§ 3.3.4.1–3. The first purpose -- injunctive relief -- is applicable to this case.

ProMedica argues the FTC "viewed 'relief' as something it may seek *in the future*, but not something that it was seeking as part of any of the documents served in August 2010." (Doc. No. 41 at 15) (emphasis in original). In doing so, ProMedica attempts to rewrite the definition of Claim to require a statement of immediate relief in the investigation notice (Doc. No. 30-1 at 15). There is no such requirement in the Policies. ProMedica was well aware the FTC investigation concerned the

9

acquisition and potential violation of the antitrust laws. What purpose, other than injunctive relief, could the FTC have? Any doubts in this regard are put to rest with the HSA, which required ProMedica to be prepared to undo the St. Luke's merger.

In other words, the HSA certainly is a type of injunctive relief. ProMedica argues that because the HSA states "[n]othing in this Agreement shall be construed to *limit the type or scope of relief* the [FTC] may seek . . . ." the HSA is not seeking relief (Doc. No. 30-1 at 17) (emphasis in original). But that interpretation ignores the plain meaning of the HSA as a whole. The HSA prevents ProMedica from absorbing St. Luke's into its operation for a period of sixty days following the acquisition; and further requires ProMedica to maintain St. Luke's viability, its current staff, and its contracts with health insurance carriers (Doc. No. 27-8). Simply put, the HSA had the practical effect, and purpose, of a temporary restraining order on ProMedica completing the acquisition.

## WAS THE INVESTIGATION FOR A WRONGFUL ACT

"[I]nvestigations . . . commenced by a formal or informal investigative order or similar document [are a] Claim." *MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 162 (2d Cir. 2011) (internal quotations omitted). Further, "the case law suggests that Subpoenas and Investigative demands may constitute Claims where they are issued by government investigative agencies . . . ." *Ace Am. Ins. Co. v. Ascend One. Corp.*, 570 F. Supp. 2d 789, 796 (D. Md. 2008). Here, ProMedica argues the formal investigative order was merely "[t]o determine whether" a violation would occur and did not allege a Wrongful Act (Doc. No. 30-1 at 15). ProMedica further points out the HSA did not even mention "antitrust," the "Clayton Act," or the "Federal Trade Commission Act" (Doc. No. 30-1 at 16). Likewise, the CID "stated that it was issued in the course of an investigation *to determine whether* there is, has been, or may be a violation of any laws administered by the Federal Trade Commission." (Doc. No. 30-1 at 18) (emphasis in original).

10

ProMedica states the FTC needed to "come to a conclusion" the Wrongful Act had in fact occurred (Doc. No. 46 at 5). "The linchpin is an allegation that something has happened" (Doc. No. 46 at 15); and a conclusion was not made (in writing) until formal court filings in January 2011, after the 09/10 Policy had expired (Doc. No. 46 at 5–6). OneBeacon counters that the "plain terms of the Policy" state a "formal investigative order" for an "alleged" violation of FTC laws satisfies the definition of Claim.

Although the Policies do not define "allege," ProMedica attempts to draw a distinction between an "investigation to determine whether" there has been a Wrongful Act and an "alleged" Wrongful Act (Doc. No. 40-1 at 9). If there is a distinction, it is without a difference. ProMedica, citing to MERRIAM-WEBSTER'S ONLINE DICTIONARY, defines "allege" as "to assert without proof or before proving" (Doc. No. 41 at 9). When the FTC conducted a formal investigation, ordered compulsory process, and entered into an HSA with ProMedica, it did so pursuant to the allegation that the acquisition was unlawful.

ProMedica argues the FTC actions explicitly foreclose any allegations of Wrongful Acts because in July the FTC said "the existence of this non-public investigation should [not] be construed as indicating that a violation has occurred or is occurring" (Doc. No. 30-1 at 15). But that letter was sent before the investigation became formal, before the subpoenas and CID were issued, and before the HSA. This was no longer "simply an investigation" (Doc. No. 46 at 13). There was an HSA in August, by which time the FTC had transitioned to a full-phase investigation, a clear signal that this was not an "open and shut" case for ProMedica.

This investigation triggered notice because the 09/10 Policy specifically included a "formal investigative order" under its definition of a Claim. Even when the definition of a claim does not include a "formal investigative order," courts still find such orders to constitute claims against

11

insureds for wrongful acts. *See Polychron v. Crum & Forster Inc. Cos.*, 916 F.2d 461, 463 (8th Cir. 1990) (order to produce documents amounted to allegation of wrong doing); *Minutemen Int'l, Inc. v. Great Am. Ins. Co.*, 2004 WL 603482 at *7 (N.D. Ill. Mar. 22, 2004) (investigation constituted claim).

This Court disagrees that the FTC actions could only trigger notice required under the Policy if and when the FTC determined an antitrust violation had in fact occurred. Such a reading of the Policy would render "formal investigative order" meaningless. And, whatever assurances ProMedica had that the FTC investigation was meritless necessarily ended when ProMedica received the CID and HSA in August. The Policy did not require the FTC to conclude that a Wrongful Act had occurred; formal investigation for an antitrust violation is sufficient, a requirement clearly met when the FTC stepped up its demands and required ProMedica to agree to what was essentially a temporary restraining order -- the HSA -- by August (Doc. No. 46 at 11).

ProMedica attempts to distinguish cases where the court found a claim when wrongful conduct was "only" alleged. Specifically, ProMedica cites the SEC order at issue in *MBIA*: "Members of the staff have reported information to the Commission which tends to show that . . . [c]ertain persons or entities *may* have . . . employed devices, schemes, or artifices to defraud . . . ." (Doc. No. 30-1 at 15–16) (emphasis added). According to ProMedica, this alleges a Wrongful Act. By comparison, the FTC's Order to ProMedica stated:

> This demand is issued pursuant to Section 20 of the Federal Trade commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine *whether* there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action . . . .

(Doc. No. 27-12 at 1) (emphasis added). It is neither "natural" nor "usual" to read into the Policies a definition of "allege" turning upon the usage of "may" versus "whether." *See Watkins*, 97 Ohio App. 3d at 164. Such parsing distorts the common sense reading of the Policies.

12

Finally, ProMedica relies on *Office Depot, Inc. v. National Union Fire Ins. Co.*, 2011 WL 4840951 (11th Cir. Oct 13, 2011), arguing that case requires more than the August FTC actions to establish a Claim (Doc. No. 42 at 1). In *Office Depot*, the SEC sent informal letters of an initial inquiry and several months later issued a formal order with Wells Notices -- notices that the SEC is nearing a recommendation to take action for violation of securities law. 2011 WL 4840951 at *1. That court held a claim did not exist when Office Depot received the informal letters requesting the preservation of documents. *Id.* at *4. The court also recognized the Wells Notices triggered a claim -- a point conceded by the insurers -- because they alleged violation of specific laws by a specific person. *Id.*

Like the SEC in *Office Depot*, the FTC here sent ProMedica informal letters in July -- no one contends those letters created a Claim -- and later began a formal investigation. OneBeacon argues the formal investigation gave rise to a Claim. ProMedica, relying on *Office Depot*, disagrees because the FTC did not send the equivalent of Wells Notices during the 09/10 Policy Period. However, *Office Depot* differs significantly from this case because that policy excluded coverage for general organizational liability and only covered an organization's indemnification of an individual. *Id.* at *3. For a claim to arise, an "Insured Person [had to be] identified in writing . . . or the service of a subpoena upon such Insured Person." *Id.* at *3. ProMedica's Policies contain no such exclusion, and covered the organization itself. Therefore, when ProMedica received the formal FTC investigation order, it required no further specificity to realize a Claim had arisen. The FTC was investigating a Wrongful Act.

Moreover, *Office Depot* does not stand for the principle ProMedica desires -- chiefly that Wells Notices, or their equivalent, are the minimum required for a claim to arise. Rather the case demonstrates that these inquiries largely turn on the terms of the policy and the specific underlying facts. Under the plain meaning of the Policies here, the FTC August actions clearly allege a Wrongful Act.

## CONCLUSION

The definition of Claim is not ambiguous. A Claim requires an administrative or court filing for injunctive relief or a formal investigation pursuing injunctive relief. This Court finds a Claim arose in August during the 09/10 Policy Period. Therefore, ProMedica's failure to notify OneBeacon of the Claim prior to the December expiration of the Extended Reporting Period precludes coverage under that claims-made policy.

OneBeacon's Motion for Summary Judgment is granted; ProMedica's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

      s/ *Jack Zouhary*
    JACK ZOUHARY
    U. S. DISTRICT JUDGE

December 31, 2011